# HUNT *v.* McNAIR, GOVERNOR OF SOUTH CAROLINA, ET AL.

No. 71–1523.   Argued February 21, 1973—Decided June 25, 1973

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post,* p. 749.

*Robert McC. Figg, Jr.,* argued the cause for appellant. With him on the brief was *Thomas B. Bryant, Jr.*

*Huger Sinkler* argued the cause for appellees. With him on the brief were *Daniel R. McLeod,* Attorney General of South Carolina, and *Theodore B. Guerard.**

MR. JUSTICE POWELL delivered the opinion of the Court.

Appellant, a South Carolina taxpayer, brought this action to challenge the South Carolina Educational Facilities Authority Act (the Act), S. C. Code Ann. § 22–

---

**George F. Kugler, Jr.,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Charles R. Parker* and *Lewis M. Popper,* Deputy Attorneys General, filed a brief for the State of New Jersey as *amicus curiae* urging affirmance.

41 *et seq.* (Supp. 1971), as violative of the Establishment Clause of the First Amendment insofar as it authorizes a proposed financing transaction involving the issuance of revenue bonds for the benefit of the Baptist College at Charleston (the College).[1] The trial court's denial of relief was affirmed by the Supreme Court of South Carolina. 255 S. C. 71, 177 S. E. 2d 362 (1970). This Court vacated the judgment and remanded the case for reconsideration in light of the intervening decisions in *Lemon* v. *Kurtzman, Earley* v. *DiCenso,* and *Robinson* v. *DiCenso,* 403 U. S. 602 (1971); and *Tilton* v. *Richardson,* 403 U. S. 672 (1971). 403 U. S. 945 (1971). On remand, the Supreme Court of South Carolina adhered to its earlier position. 258 S. C. 97, 187 S. E. 2d 645 (1972). We affirm.

I

We begin by setting out the general structure of the Act. The Act established an Educational Facilities Authority (the Authority), the purpose of which is "to assist institutions for higher education in the construction, financing and refinancing of projects . . . ," S. C. Code Ann. § 22–41.4 (Supp. 1971), primarily through the issuance of revenue bonds. Under the terms of the Act, a project may encompass buildings, facilities, site preparation, and related items, but may not include

"any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school

---

[1] At various points during this litigation, appellant has made reference to the Free Exercise Clause of the First Amendment, but has made no arguments specifically addressed to violations of that Clause except insofar as this Court's approach to cases involving the Religion Clauses represents an interaction of the two Clauses.

or department of divinity for any religious denomination." S. C. Code Ann. § 22–41.2 (b) (Supp. 1971).

Correspondingly, the Authority is accorded certain powers over the project, including the powers to determine the fees to be charged for the use of the project and to establish regulations for its use. See *infra,* at 747–749.

While revenue bonds to be used in connection with a project are issued by the Authority, the Act is quite explicit that the bonds shall not be obligations of the State, directly or indirectly:

"Revenue bonds issued under the provisions of this chapter shall not be deemed to constitute a debt or liability of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision, but shall be payable solely from the funds herein provided therefor from revenues. All such revenue bonds shall contain on the face thereof a statement to the effect that neither the State of South Carolina nor the Authority shall be obligated to pay the same or the interest thereon except from revenues of the project or the portion thereof for which they are issued and that neither the faith and credit nor the taxing power of the State of South Carolina or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds. The issuance of revenue bonds under the provisions of this chapter shall not directly or indirectly or contingently obligate the State or any political subdivision thereof to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment." S. C. Code Ann. § 22–41.10 (Supp. 1971).

Moreover, since all of the expenses of the Authority must be paid from the revenues of the various projects in which it participates, S. C. Code Ann. § 22–41.5 (Supp. 1971), none of the general revenues of South Carolina is used to support a project.

On January 6, 1970, the College submitted to the Authority for preliminary approval an application for the issuance of revenue bonds. Under the proposal, the Authority would issue the bonds and make the proceeds available to the College for use in connection with a portion of its campus to be designated a project (the Project) within the meaning of. the Act. In return, the College would convey the Project, without cost, to the Authority, which would then lease the property so conveyed back to the College. After payment in full of the bonds, the Project would be reconveyed to the College. The Authority granted preliminary approval on January 16, 1970, 255 S. C., at 76, 177 S. E. 2d, at 365.

In its present form, the application requests the issuance of revenue bonds totaling $1,250,000, of which $1,050,000 would be applied to refund short-term financing of capital improvements and $200,000 would be applied to the completion of dining hall facilities.[2] The

---

[2] As originally submitted by the College and approved by the Authority, the proposal called for the issuance of "not exceeding $3,500,000 of revenue bonds . . . ." 255 S. C. 71, 75, 177 S. E. 2d 362, 364. As indicated by a stipulation of counsel in this Court, the College subsequently secured a bank loan in the amount of $2,500,000 and now proposes the issuance of only $1,250,000 in revenue bonds under the Act, the proceeds to be used:

"(i) to repay in full the College's Current Fund for the balance (approximately $250,000) advanced to the College's Plant Fund as aforesaid; (ii) to refund outstanding short-term loans in the amount of $800,000 whose proceeds were to pay off indebtedness incurred for *capital improvements,* and (iii) to finance the completion of the dining hall facilities at a cost of approximately $200,000." App. 49. (Emphasis in original.)

advantage of financing educational institutions through a state-created authority derives from relevant provisions of federal and South Carolina state income tax laws which provide in effect that the interest on such bonds is not subject to income taxation.[3] The income-tax-exempt status of the interest enables the Authority, as an instrumentality of the State, to market the bonds at a significantly lower rate of interest than the educational institution would be forced to pay if it borrowed the money by conventional private financing.

Because the College's application to the Authority was a preliminary one, the details of the financing arrangement have not yet been fully worked out. But Rules and Regulations adopted by the Authority govern certain of its aspects. See Jurisdictional Statement, Appendix C, pp. 47–51. Every lease agreement between the Authority and an institution must contain a clause

> "obligating the Institution that neither the leased land, nor the facility located thereon, shall be used for sectarian instruction or as a place of religious worship, or in connection with any part of the program of a school or department of divinity of any religious denomination." 258 S. C., at 101, 187 S. E. 2d, at 647.

To insure that this covenant is honored, each lease agreement must allow the Authority to conduct inspections, and any reconveyance to the College must contain a

---

[3] Gross income for federal income tax purposes does not include interest on "the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing . . . ." 26 U. S. C. § 103 (a) (1). For state income tax purposes, gross income does not include interest "upon obligations of the United States or its possessions or of this State or any political subdivision thereof . . . ." S. C. Code Ann. § 65–253 (4) (Supp. 1971).

restriction against use for sectarian purposes.[4] The Rules further provide that simultaneously with the execution of the lease agreement, the Authority and the trustee bank would enter into a Trust Indenture which would create, for the benefit of the bondholders, a foreclosable mortgage lien on the Project property including a mortgage on the "right, title and interest of the Authority in and to the Lease Agreement." Jurisdictional Statement, Appendix C, p. 50.

Our consideration of appellant's Establishment Clause claim extends only to the proposal as approved preliminarily with such additions as are contemplated by the Act, the Rules, and the decisions of the courts below.

---

[4] Rule 4 relating to the Lease Agreement provides in part that:

"If the Lease Agreement contains a provision permitting the Institution to repurchase the project upon payment of the bonds, then in such instance the Lease Agreement shall provide that the Deed of reconveyance from the Authority to the Institution shall be made subject to the condition that so long as the Institution, or any voluntary grantee of the Institution, shall own the leased premises, or any part thereof, that no facility thereon, financed in whole or in part with the proceeds of the bonds, shall be used for sectarian instruction or as a place of religious worship, or used in connection with any part of the program of a school or department of divinity of any religious denomination." 258 S. C. 97, 101–102, 187 S. E. 2d 645, 647–648.

The Rule goes on to allow the institution to remove this option in the case of involuntary sales:

"The condition may provide, at the option of the Institution, that if the leased premises shall become the subject of an involuntary judicial sale, as a result of any foreclosure of any mortgage, or sale pursuant to any order of any court, that the title to be vested in any purchaser at such judicial sale, other than the Institution, shall be in fee simple and shall be free of the condition applicable to the Institution or any voluntary grantee thereof." 258 S. C., at 102, 187 S. E. 2d, at 648. See n. 6, *infra.*

## II

As we reaffirm today in *Committee for Public Education & Religious Liberty* v. *Nyquist, post,* p. 756, the principles which govern our consideration of challenges to statutes as violative of the Establishment Clause are three:

> "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . ; finally, the statute must not foster 'an excessive government entanglement with religion.' " *Lemon* v. *Kurtzman,* 403 U. S., at 612–613.

With full recognition that these are no more than helpful signposts, we consider the present statute and the proposed transaction in terms of the three "tests": purpose, effect, and entanglement.

### A

The purpose of the statute is manifestly a secular one. The benefits of the Act are available to all institutions of higher education in South Carolina, whether or not having a religious affiliation. While a legislature's declaration of purpose may not always be a fair guide to its true intent, appellant makes no suggestion that the introductory paragraph of the Act represents anything other than a good-faith statement of purpose:

> "It is hereby declared that for the benefit of the people of the State, the increase of their commerce, welfare and prosperity and the improvement of their health and living conditions it is essential that this and future generations of youth be given the fullest opportunity to learn and to develop their intellectual and mental capacities; that it is essential that institutions for higher education within

the State be provided with appropriate additional means to assist such youth in achieving the required levels of learning and development of their intellectual and mental capacities; and that it is the purpose of this chapter to provide a measure of assistance and an alternative method to enable institutions for higher education in the State to provide the facilities and structures which are sorely needed to accomplish the purposes of this chapter, all to the public benefit and good, to the extent and manner provided herein." S. C. Code Ann. § 22.41 (Supp. 1971).

The College and other private institutions of higher education provide these benefits to the State.[5] As of the academic year 1969–1970, there were 1,548 students enrolled in the College, in addition to approximately 600 night students. Of these students, 95% are residents of South Carolina who are thereby receiving a college education without financial support from the State of South Carolina.

## B

To identify "primary effect," we narrow our focus from the statute as a whole to the only transaction presently before us. Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected. *E. g.,*

---

[5] In *Board of Education* v. *Allen,* 392 U. S. 236 (1968), this Court commented on the importance of the role of private education in this country:

"Underlying these cases, and underlying also the legislative judgments that have preceded the court decisions, has been a recognition that private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience." *Id.,* at 247.

*Bradfield* v. *Roberts,* 175 U. S. 291 (1899); *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970); *Tilton* v. *Richardson,* 403 U. S. 672 (1971). Stated another way, the Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.

Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting. In *Tilton* v. *Richardson, supra,* the Court refused to strike down a direct federal grant to four colleges and universities in Connecticut. MR. CHIEF JUSTICE BURGER, for the plurality, concluded that despite some institutional rhetoric, none of the four colleges was pervasively sectarian, but held open that possibility for future cases:

> "Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics." *Id.,* at 682.

Appellant has introduced no evidence in the present case placing the College in such a category. It is true that the members of the College Board of Trustees are elected by the South Carolina Baptist Convention, that the approval of the Convention is required for certain financial transactions, and that the charter of the College may be amended only by the Convention. But it was likewise true of the institutions involved in *Tilton* that they were "governed by Catholic religious organizations." *Id.,* at 686. What little there is in the record concerning the College establishes that there are no religious qualifications for faculty membership or student

admission, and that only 60% of the College student body is Baptist, a percentage roughly equivalent to the percentage of Baptists in that area of South Carolina. 255 S. C., at 85, 177 S. E. 2d, at 369. On the record in this case there is no basis to conclude that the College's operations are oriented significantly towards sectarian rather than secular education.

Nor can we conclude that the proposed transaction will place the Authority in the position of providing aid to the religious as opposed to the secular activities of the College. The scope of the Authority's power to assist institutions of higher education extends only to "projects," and the Act specifically states that a project "shall not include" any buildings or facilities used for religious purposes. In the absence of evidence to the contrary, we must assume that all of the proposed financing and refinancing relates to buildings and facilities within a properly delimited project. It is not at all clear from the record that the portion of the campus to be conveyed by the College to the Authority and leased back is the same as that being financed, but in any event it too must be part of the Project and subject to the same prohibition against use for religious purposes. In addition, as we have indicated, every lease agreement must contain a clause forbidding religious use and another allowing inspections to enforce the agreement.[6] For these reasons,

---

[6] Appellant also takes issue with the Authority's rule allowing a purchaser at an involuntary sale to take title free of restrictions as to religious use. See n. 4, *supra*. Appellant's reliance on *Tilton* v. *Richardson,* 403 U. S. 672 (1971), in this respect is misplaced. There, the Court struck down a provision under which the church-related colleges would have unrestricted use of a federally financed project after 20 years. In the present case, by contrast, the restriction against religious use is lifted, not as to the institution seeking the assistance of the Authority nor as to voluntary transferees, but only as to a purchaser at a judicial sale. Because some other religious institution bidding for the property at a judicial sale could purchase the prop-

we are satisfied that implementation of the proposal will not have the primary effect of advancing or inhibiting religion.[7]

C

The final question posed by this case is whether under the arrangement there would be an unconstitutional degree of entanglement between the State and the College. Appellant argues that the Authority would become involved in the operation of the College both by inspecting the project to insure that it is not being used for religious

---

erty only by outbidding all other prospective purchasers, there is only a speculative possibility that the absence of a use limitation would ever afford aid to religion. Even in such an event, the acquiring religious institution presumably would have had to pay the then fair value of the property.

[7] The "state aid" involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available. The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a "governmental service." *Clayton* v. *Kervick,* 56 N. J. 523, 530–531, 267 A. 2d 503, 506–507 (1970). The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a "mere conduit." 258 S. C., at 107, 187 S. E. 2d, at 650. Because we conclude that the primary effect of the assistance afforded here is neither to advance nor to inhibit religion under *Lemon* and *Tilton,* we need not decide whether, as appellees argue, Brief for Appellees 14, the importance of the tax exemption in the South Carolina scheme brings the present case under *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970), where this Court upheld a local property tax exemption which included religious institutions.

purposes and by participating in the management decisions of the College.

The Court's opinion in *Lemon* and the plurality opinion in *Tilton* are grounded on the proposition that the degree of entanglement arising from inspection of facilities as to use varies in large measure with the extent to which religion permeates the institution. In finding excessive entanglement, the Court in *Lemon* relied on the "substantial religious character of these church-related" elementary schools. 403 U. S., at 616. MR. CHIEF JUSTICE BURGER's opinion for the plurality in *Tilton* placed considerable emphasis on the fact that the federal aid there approved would be spent in a college setting:

> "Since religious indoctrination is not a substantial purpose or activity of these church-related colleges and universities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education." 403 U. S., at 687.

Although MR. JUSTICE WHITE saw no such clear distinction, he concurred in the judgment, stating:

> "It is enough for me that . . . the Federal Government [is] financing a separable secular function of overriding importance in order to sustain the legislation here challenged." 403 U. S., at 664.

A majority of the Court in *Tilton*, then, concluded that on the facts of that case inspection as to use did not threaten excessive entanglement. As we have indicated above, there is no evidence here to demonstrate that the College is any more an instrument of religious indoctrination than were the colleges and universities involved in *Tilton*.[8]

---

[8] Although the record in this case is abbreviated and not free from ambiguity, the burden rests on appellant to show the extent

A closer issue under our precedents is presented by the contention that the Authority could become deeply involved in the day-to-day financial and policy decisions of the College. The Authority is empowered by the Act:

> "(g) [g]enerally, to fix and revise from time to time and charge and collect rates, rents, fees and charges for the use of and for the services furnished or to be furnished by a project or any portion thereof and to contract with any person, partnership, association or corporation or other body public or private in respect thereof;
>
> "(h) [t]o establish rules and regulations for the use of a project or any portion thereof and to designate a participating institution for higher education as its agent to establish rules and regulations for the use of a project undertaken for such participating institution for higher education. . . ." S. C. Code Ann. § 22–41.4 (Supp. 1971).

These powers are sweeping ones, and were there a realistic likelihood that they would be exercised in their full detail, the entanglement problems with the proposed transaction would not be insignificant.

As the South Carolina Supreme Court pointed out, 258 S. C., at 107, 187 S. E. 2d, at 651, the Act was patterned closely after the South Carolina Industrial Revenue Bond Act, and perhaps for this reason appears to

---

to which the College is church related, cf. *Board of Education* v. *Allen,* 392 U. S., at 248, and he has failed to show more than a formalistic church relationship. As *Tilton* established, formal denominational control over a liberal arts college does not render all aid to the institution a violation of the Establishment Clause. So far as the record here is concerned, there is no showing that the College places any special emphasis on Baptist denominational or any other sectarian type of education. As noted above, both the faculty and the student body are open to persons of any (or no) religious affiliation.

confer unnecessarily broad power and responsibility on the Authority. The opinion of that court, however, reflects a narrow interpretation of the practical operation of these powers:

> "Counsel for plaintiff argues that the broad language of the Act causes the State, of necessity, to become excessively involved in the operation, management and administration of the College. We do not so construe the Act. . . . [T]he basic function of the Authority is to see . . . that fees are charged sufficient to meet the bond payments." *Id.*, at 108, 187 S. E. 2d, at 651.

As we read the College's proposal, the Lease Agreement between the Authority and the College will place on the College the responsibility for making the detailed decisions regarding the government of the campus and the fees to be charged for particular services. Specifically, the proposal states that the Lease Agreement

> "will unconditionally obligate the College (a) to pay sufficient rentals to meet the principal and interest requirements as they become due on such bonds, [and] (b) to impose an adequate schedule of charges and fees in order to provide adequate revenues with which to operate and maintain the said facilities and to make the rental payments . . . ." App. 18.

In short, under the proposed Lease Agreement, neither the Authority nor a trustee bank would be justified in taking action unless the College fails to make the prescribed rental payments or otherwise defaults in its obligations. Only if the College refused to meet rental payments or was unable to do so would the Authority or the trustee be obligated to take further action. In that event, the Authority or trustee might either fore-

close on the mortgage or take a hand in the setting of rules, charges, and fees. It may be argued that only the former would be consistent with the Establishment Clause, but we do not now have that situation before us.

## III

This case comes to us as an action for injunctive and declaratory relief to test the constitutionality of the Act as applied to a proposed—rather than an actual— issuance of revenue bonds. The specific provisions of the Act under which the bonds will be issued, the Rules and Regulations of the Authority, and the College's proposal—all as interpreted by the South Carolina Supreme Court—confine the scope of the assistance to the secular aspects of this liberal arts college and do not foreshadow excessive entanglement between the State and religion. Accordingly, we affirm the holding of the court below that the Act is constitutional as interpreted and applied in this case.

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

The question presented in this case is whether South Carolina's assistance to the Baptist College at Charleston under the South Carolina Educational Facilities Authority Act constitutes constitutionally impermissible aid by the State for this sectarian institution.[1] The test to which I adhere for determining such questions is whether the arrangement between the State and the

---

[1] No one denies that the Baptist College at Charleston is a "sectarian" institution—*i. e.,* one "in which the propagation and advancement of a particular religion are a function or purpose of the institution." *Lemon* v. *Kurtzman,* 403 U. S. 602, 659 (1971) (separate opinion of BRENNAN, J.).

Baptist College is foreclosed under the Establishment Clause of the First Amendment as being among

> "those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice." *Abington School District* v. *Schempp,* 374 U. S. 203, 295 (1963) (BRENNAN, J., concurring); *Walz* v. *Tax Comm'n,* 397 U. S. 664, 680–681 (1970) (BRENNAN, J., concurring); *Lemon* v. *Kurtzman,* 403 U. S. 602, 643 (1971) (*Lemon I*) (separate opinion of BRENNAN, J.).

Because under that test it is clear to me that the State's proposed scheme of assistance to the Baptist College is violative of the Establishment Clause, I dissent.

The act authorizes a financing arrangement between the Authority [2] and the Baptist College at Charleston, a South Carolina educational corporation operated by the South Carolina Baptist Convention. Under that arrangement, the College would convey a substantial portion of its campus to the Authority, and the Authority would lease back the property to the College at an agreed rental. The Authority would then issue revenue bonds of the State of South Carolina in the amount of $3,500,000, which bonds would be payable, principal

---

[2] The South Carolina Educational Facilities Authority is composed of the members of the State Budget and Control Board, who are the Governor, the State Treasurer, the State Comptroller General, the Chairman of the Finance Committee of the State Senate, and the Chairman of the Ways and Means Committee of the State House of Representatives. The Act states that "all the functions and powers of the Authority are hereby granted to the State Budget and Control Board as an incident of its functions in connection with the public finances of the State." S. C. Code Ann. § 22–41.3 (Supp. 1971).

and interest, from the rents paid by the College to the Authority under the lease. The proceeds of the sale of the bonds would be used to pay off outstanding indebtedness of the College [3] and to construct additional buildings and facilities for use in its higher education operations. Upon payment in full of the principal and interest on the bonds, the arrangement requires that the Authority reconvey title to the campus properties to the College free and clear of all liens and encumbrances. The arrangement does not, however, amount merely to a mortgage on the campus property. The Authority is also empowered, *inter alia,* to determine the location and character of any project financed under the act; to construct, maintain, manage, operate, lease as lessor or lessee, and regulate the same; to enter into contracts for the management and operation of such project; to establish rules and regulations for the use of the project or any portion thereof; and to fix and revise from time to time rates, rents, fees, and charges for the use of a project and for the services furnished or to be furnished by a project or any portion thereof. In other words, the College turns over to the State Authority control of substantial parts of the fiscal operation of the school—its very life's blood.

It is true that the Act expressly provides that State financing will not be provided for

> "any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomi-

---

[3] This outstanding indebtedness pertains to certain unspecified "capital improvements." App. 49. Thus, it may be that the indebtedness was incurred for improvements to facilities used for religious purposes.

nation." S. C. Code Ann. § 22–41.2 (b) (Supp. 1971).

And it is also true that the Authority, pursuant to granted rule-making power, has adopted a rule requiring that each lease agreement contain a covenant

"obligating the Institution that neither the leased land, nor any facility located thereon, shall be used for sectarian instruction or as a place of religious worship, or in connection with any part of the program of a school or department of divinity of any religious denomination." 258 S. C., at 101, 187 S. E. 2d, at 647.

But policing by the Authority to insure compliance with these restrictions is established by a provision required to be included in the lease agreement allowing the Authority to conduct on-site inspections of the facilities financed under the act.

Thus, it is crystal clear, I think, that this scheme involves the State in a degree of policing of the affairs of the College far exceeding that called for by the statutes struck down in *Lemon I, supra.* See also *Johnson* v. *Sanders,* 319 F. Supp. 421 (Conn. 1970), aff'd, 403 U. S. 955 (1971). Indeed, under this scheme the policing by the State can become so extensive that the State may well end up in complete control of the operation of the College, at least for the life of the bonds. The College's freedom to engage in religious activities and to offer religious instruction is necessarily circumscribed by this pervasive state involvement forced upon the College if it is not to lose its benefits under the Act. For it seems inescapable that the content of courses taught in facilities financed under the agreement must be closely monitored by the State Authority in discharge of its duty to ensure that the facilities are not being used for sectarian instruction. The Authority must also involve itself

deeply in the fiscal affairs of the College, even to the point of fixing tuition rates, as part of its duty to assure sufficient revenues to meet bond and interest obligations. And should the College find itself unable to meet these obligations, its continued existence as a viable sectarian institution is almost completely in the hands of the State Authority. Thus, this agreement, with its consequent state surveillance and ongoing administrative relationships, inescapably entails mutually damaging Church-State involvements. *Abington School District* v. *Schempp,* 374 U. S., at 295 (BRENNAN, J., concurring); *Lemon I,* 403 U. S., at 649 (separate opinion of BRENNAN, J.).

In support of its contrary argument, the Court adopts much of the reasoning of the plurality opinion in *Tilton* v. *Richardson,* 403 U. S. 672 (1971). I disagreed with that reasoning in *Tilton* because, as in this case, that reasoning utterly failed to explain how programs of surveillance and inspection of the kind common to both cases differ from the Pennsylvania and Rhode Island programs invalidated in *Lemon I.* What I said in *Tilton* is equally applicable to the present case:

> "I do not see any significant difference in . . . telling the sectarian university not to teach any nonsecular subjects in a certain building, and Rhode Island's telling the Catholic school teacher [in *Lemon I*] not to teach religion. The vice is the creation through subsidy of a relationship in which the government polices the teaching practices of a religious school or university." 403 U. S., at 660 (separate opinion of BRENNAN, J.).

In any event, *Tilton* is clearly not controlling here. The plurality opinion in *Tilton* was expressly based on the premise, erroneous in my view, that the Federal Higher Education Facilities Act contained no significant

intrusions into the everyday affairs of sectarian educational institutions. Thus, it was said in the plurality opinion:

> "[U]nlike the direct and continuing payments under the Pennsylvania program [in *Lemon I*], and all the incidents of regulation and surveillance, the Government aid here is a one-time, single-purpose construction grant. There are no continuing financial relationships or dependencies, no annual audits, and no government analysis of an institution's expenditures on secular as distinguished from religious activities." 403 U. S., at 688.

But under the South Carolina scheme, "continuing financial relationships or dependencies," "annual audits," "government analysis," and "regulation and surveillance" are the core features of the arrangement. In short, the South Carolina statutory scheme as applied to this sectarian institution presents the very sort of "intimate continuing relationship or dependency between government and religiously affiliated institutions" that in the plurality's view was lacking in *Tilton. Ibid.*

Nor is the South Carolina arrangement between the State and this College any less offensive to the Constitution because it involves, as the Court asserts, no direct financial support to the College by the State. The Establishment Clause forbids far more than payment of public funds directly to support sectarian institutions. It forbids any official involvement with religion, whatever its form, which tends to foster or discourage religious worship or belief. The cases are many in which we have struck down on establishment grounds state laws that provided, not direct financial support to religious institutions, but various other forms of assistance. *McCollum v. Board of Education*, 333 U. S. 203 (1948) ("release time" program); *Engel* v. *Vitale*, 370 U. S. 421 (1962)

(prayer reading in public schools); *Abington School District* v. *Schempp,* 374 U. S. 203 (1963) (Bible reading in public schools). Moreover, any suggestion that the constitutionality of a statutory program to aid sectarian institutions is dependent on whether that aid can be characterized as direct or indirect is flatly refuted by the Court's decisions today in *Committee for Public Education & Religious Liberty* v. *Nyquist, post,* p. 756, and *Sloan* v. *Lemon, post,* p. 825. In those cases, we went behind the mere assertion that tuition reimbursement and tax exemption programs provided no direct aid to sectarian schools and concluded that the "substantive impact" of such programs was essentially the same as a direct subsidy from the State.

The South Carolina arrangement has the identical constitutional infirmities. The State forthrightly aids the College by permitting the College to avail itself of the State's unique ability to borrow money at low interest rates, and the College, in turn, surrenders to the State a comprehensive and continuing surveillance of the educational, religious, and fiscal affairs of the College. The conclusion is compelled that this involves the State in the "essentially religious activities of religious institutions" and "employ[s] the organs of government for essentially religious purposes." I therefore dissent and would reverse the judgment of the Supreme Court of South Carolina.