Michael SMITH, Plaintiff,

v.

The BOARD OF GOVERNORS OF the
UNIVERSITY OF NORTH CAROLINA
et al., Defendants.

No. C-C-76-131.

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 30, 1977.

Walter H. Bennett, Jr., Charlotte, N.C., and James W. Respess, Silver Spring, Md., for plaintiff.

Rufus L. Edmisten, Atty. Gen., for State of North Carolina, and James Wallace, Jr., Asst. Atty. Gen., for Board of Governors of the University of North Carolina.

William L. Rikard, Jr. and Joseph W. Grier, Jr., Grier, Parker, Poe, Thompson Bernstein, Gage & Preston, Charlotte, N.C., and Basil L. Whitener, Gastonia, N.C., for Belmont Abbey College.

Henry C. Doby, Jr., Albemarle, N.C., for Pfeiffer College.

Before HAYNSWORTH, Chief Circuit Judge, JONES, Chief District Judge, and McMILLAN, District Judge.

PER CURIAM:

A statutory three-judge court was convened to consider this constitutional challenge to North Carolina statutes extending tuition grants and scholarships to students enrolled in church-related colleges. The challenge is not to the entire program in a vacuum, but it is contended that sectarianism is so pervasive at Belmont Abbey College and Pfeiffer College that state tuition grants and scholarships to students at those institutions are in violation of the First Amendment. It is not contended that such pervasiveness is present at other church-related institutions, such as Duke University.

I.

NORTH CAROLINA'S PROGRAMS

North Carolina has three separate programs which channel state funds into tuition assistance for North Carolina residents attending independent colleges in North Carolina, including church-related ones.

A.

The first, enacted in 1971 (N.C.G.S. § 116–19, et seq.) was enacted as a result of a general study of higher education in North Carolina. The study resulted in some reformation of the system of state institutions and a recognition of the state's need to keep private and independent colleges in the state financially healthy and viable and open to North Carolina residents. It was recognized that their tuition costs were relatively high and that many deserving North Carolina students could not afford to attend them.

Under the 1971 statutes, as amended, funds are granted to the private colleges in the state, including those with church relations, on the basis of the number of North Carolina resident students enrolled in them on a full time basis. These funds are disbursed by the North Carolina Board of Higher Education to individual colleges under contracts which obligate the colleges to use the funds for scholarship assistance to financially needy North Carolina resident students. To participate, a college must be accredited by the Southern Association of Colleges and Schools and must not be a "seminary Bible school, Bible college or similar religious institution." By an amendment adopted in 1975,[1] the scholarships may be granted only for secular education. By an amendment enacted in 1976,[2] each recipient college must keep the funds received from the state in a separate, identifiable account, and it must notify each scholarship recipient of the source of the funds. At the end of each year, any funds unused for the authorized purpose must be returned to the state. The current contracts between the

---

1. 1975 Session Laws, Chapter 875, § 30.

2. 1975 Session Laws, Second Session, Chapter 983, § 54.

Board and the colleges specifically exclude from scholarship eligibility any student pursuing a course of study primarily designed to prepare the student for a career in a religious vocation.

The principal officer of each participating institution is required to submit certificates and reports showing compliance with the requirements of the statutes, the Board's regulations and the contract provisions, including a certification that all of the funds are used for secular educational purposes only. The Board has required no post-year audits of the records of the colleges, but has required reports showing in detail the disbursement of the funds.

### B.

Because of the higher tuition costs in private institutions, the growing enrollment in state institutions and the limitation of the 1971 program to scholarships for needy students, in 1975 there was enacted another tuition grant program.[3] Under this statute, the State Education Assistance Authority was authorized and directed to grant $200 for each academic year to each North Carolina resident attending a qualified college in North Carolina on a full time basis. The qualified colleges were the same as those qualified to participate in the 1971 scholarship program. Each qualified student attending an approved institution on a full time basis must apply for the tuition grant. The participating college then certifies the eligibility of each applying student, whereupon the Authority disburses to each approved college the sum of $200 multiplied by the number of eligible students enrolled on a full time basis in that institution. No cash is remitted to the students, but each participating student receives a credit of $200 on his bill, and the regulations require that each student receive notice of the tuition reduction. The statute provides that these funds may be used for secular educational purposes only, and the regulations specifically provide for the exclusion of any

student enrolled in a program designed as preparation for a religious vocation.

The Authority has conducted post-year audits of seven participating colleges, including Belmont Abbey and Pfeiffer. The first of these was said to have taken one and one-half days, but later ones took as little as one-half day each. The procedure was said to be quick, mechanical and not judgmental.

### C.

In 1975, the North Carolina legislature decided to participate in the federal program of "Grants to States for State Student Incentives".[4] Five Hundred Thousand Dollars ($500,000) in state funds were appropriated for its participating share for the year 1975–76, and $650,000 as its share for 1976–77.[5] These funds are administered by the State Education Assistance Authority, and they are available for scholarship grants to post-secondary school undergraduate students "on the basis of substantial financial need."[6] The Authority has contracted with College Foundation, Inc., a non profit institution, for administrative assistance in identifying eligible students with the greatest financial need.

In addition to showing greater financial need, a student applicant for assistance under this program must show that he is a resident of North Carolina and enrolled in an approved institution in that state, whether public or private, on a full time basis. Under North Carolina's regulations, no student pursuing a program of instruction designed as preparation for a religious vocation is eligible.

North Carolina's student selection criteria have been approved by the Federal Commissioner of Education.

### II.

### THE COLLEGES

In the organization and structure of the two colleges involved in these proceedings,

---

**3.** 1975 Session Laws, Chapter 875, § 30.

**4.** 20 U.S.C.A. § 1070c, et seq.

**5.** 1975 Session Laws, Chapter 875, § 36.

**6.** 20 U.S.C.A. § 1070c–2(b)(3).

there appears to be a pervasive sectarianism, but that sectarianism is not pervasively evident in their actual operation. The evidence shows them to be liberal arts colleges functioning in the liberal arts tradition. They are not engaged in proselytizing students or any one else.

## BELMONT ABBEY COLLEGE

Belmont Abbey College was founded by the Benedictine Monks of Belmont Abbey Monastery. The financial affairs of the Monastery are conducted by The Southern Benedictine Society, Inc., an eleemosynary corporation controlled by a Board of Trustees of whom three are appointed by the Abbot and three are elected by the Benedictine Monks of the Monastery. The Southern Benedictine Society, Inc. owns income producing properties. It maintains the Monastery and a cathedral; it pays for the living expenses of all members of the Abbey, and it makes charitable contributions.

The Southern Benedictine Society, Inc. is the owner of the entire campus occupied by Belmont Abbey College. It is leased, rent free, to Belmont Abbey College, Inc., which maintains the college buildings and campus and services any debt that may be placed upon any of the leased buildings. Belmont Abbey College, Inc. was organized by the Benedictines in 1960 to operate the college. It is governed by a self-perpetuating Board of Trustees. The by-laws provide that the Abbot and at least four other members of the Monastery must be members of the Board of Trustees of the college, but the Benedictines may not be more than 50% of the members of the Board of Trustees. The members of the Monastery must approve in writing the selection or removal of members of the Board of Trustees, any amendment to the by-laws of the college, the appointment of the college president, the adoption of any program of capital improvement or the adoption of an operating budget with a deficit. Despite the broad veto powers of members of the Monastery, however, the written approval of the members of the Monastery of the trustees elected by the Board of Trustees has been routine and perfunctory.

Some members of the Abbey serve as administrators and members of the faculty of the college. Others serve the college in other capacities. Their salaries are comparable to those of others who are not members of the Abbey, but are paid, not to the individuals, but to The Southern Benedictine Society. When its income and expenses are totaled, The Southern Benedictine Association makes a partial remission of the salary receipts to the college. These contributions of money by The Southern Benedictine Society to the college are unrestricted. Over the past five years these approximate 7.5% of the income of the college.

Catholics predominate on the Board of Trustees, the offices of administration, faculty and staff of the college. Members of the Monastery may not now constitute more than 50% of the Board of Trustees, but all but one of the lay members are Catholic. At least ten of the fourteen administrators serving from the fall of 1971 to the spring of 1976 were Catholics. Catholic preponderance on the faculty is not so great, however, though more than a majority are Catholic. At least thirty of the fifty-two members of the faculty during the 1975–76 school year were Catholic, and half of those were members of the Monastery. Seventeen members of the faculty listed no religious affiliation or preference, while five indicated affiliations with other Christian denominations. In the past, the faculty has included a Jewish Rabbi and an Islamic Moslem.

An applicant for a position on the faculty is not requested to disclose any religious preference or affiliation, and the members of the Monastery serving on the faculty have academic qualifications comparable to the rest of the faculty members.

The College does inquire about the religious affiliations and preferences of student applicants. In recent years approximately 70% of the students have been Catholic, while some fourteen other denominations or religions have been represented. Non-Catholics, however, have been favored in

scholarships granted by the college. While 30% of the students were non-Catholic in 1975–76, 38% of the scholarship funds went to non-Catholics, and 47% of the recipient students were non-Catholic.

In addition to the nearby presence of the Monastery and cathedral, religious symbols abound in the college. The Benedictines go about in clerical garb. In several of the buildings there are crucifixes, crosses, and other religious art.

In the charter of the College, the fourth stated purpose speaks of Christian inspiration, fidelity to the Christian message and of reflection upon the growing treasury of human knowledge in the light of the Catholic faith. The fourth stated charter purpose is explained in the faculty handbook and College catalog in humanistic terms. Beyond intellectual excellence, the College is concerned with the total development of the student and the contribution the student can make to the "entire human family." The students are to inquire into the meaning of their lives. As one student put it, "the Christian ideology which the College seeks to preserve is some sort of caring, compassionate concern for the human race."

Belmont Abbey College offers a broad liberal arts undergraduate program, with curriculum requirements to insure to each student a rather broad exposure. There are twenty-three academic departments, with permissible concentrations in sixteen. Theology is not one of the sixteen departments in which a student may seek a major.

Each student is required to take two courses in the Department of Theology. Three of the courses offered in that department, however, are not primarily concerned with the Christian religion. One is a comparative study of major world religions, while two others are concerned with ancient religions and mythology, though attention is given to their influence upon the Old Testament and Christianity. In 1975–76, a course in the Islamic religion was offered and taught by an Islamic Moslem. Moreover, the theology requirement can be fulfilled by transfer credits from other colleges, including public institutions. Finally, other courses concentrating primarily or entirely upon Christianity were taught as academic disciplines in which there was no appearance of an attempt to persuade the student to accept either Christian or Catholic doctrines.

There is no requirement that students attend religious services. The College has no rule against prayer in classrooms, and on rare occasions members of the faculty have opened classes with prayer. The norm, however, is that religion is not injected into the classroom, and when it is the subject of study in the Theology Department, the tone is that of the academician and not that of a spreader of the Gospel.

In general, there is academic freedom in the College. The College has adopted the 1940 Statement of Academic Freedom of the American Association of University Professors. The Faculty Handbook emphasizes the freedom of each member of the faculty to seek and impart knowledge, interpret findings and draw conclusions without interference because those conclusions are unacceptable to constituted authority within or without the institution. There is a stated limitation, however. There is to be no "dissemination of doctrines and views that are subversive to the basic principles of American political freedom and government or of the aims and purposes of the College as a Catholic institution * * *." This limitation is interpreted not to exclude objective examination even of the fundamental principles of Christian religion and of the government of the United States. One faculty member has interpreted the guidelines in the Faculty Handbook to mean that each faculty member is free to pursue the meaning and significance of serious disagreements in the human community, but is not free to seek converts to a political or religious view which thoroughly counters those upon which the American people understand themselves to be based.

Each teacher selects his own textbooks.

## PFEIFFER COLLEGE

Pfeiffer is a liberal arts college with affiliations with the United Methodist

Church. It is governed by a self-perpetuating Board of Trustees, but the by-laws require that nine of them must be Methodist women, that six be Methodist ministers, and that 60% be Methodists from the Western North Carolina Conference. All persons elected by the Board to places as trustees must be confirmed by the Western North Carolina Conference, but such confirmation has been perfunctory. Since 1971 approximately 75% of the members of the Board of Trustees have been Methodist.

There is no evidence, however, that any Methodist agency has attempted to influence the governance of Pfeiffer College. The College makes no report of any kind to the United Methodist Church or any of its divisions or agencies. The current Vice President for Academic Affairs has experienced no attempt by the Methodist Church to influence any decision of his.

Pfeiffer's current President is a Methodist lay speaker with a background as a teacher of English and a college administrator. Approximately one-half of the other administrators are Methodists, while 40% of those faculty members expressing a religious preference stated a preference for the Methodist church.

Approximately 40% of the student body is Methodist. This is a probable consequence of the Methodist identification of the institution, the extensive use of Methodist ministers in recruiting students and the fact that some of Pfeiffer's privately established scholarship funds were established by Methodists, some of which impose religious restrictions upon the selection of recipients.

Pfeiffer is accredited by the Senate of the United Methodist Church. It derives approximately 6% of its revenues from divisions of that church, and Methodist ministers are utilized in the solicitation of private donations to the College. Methodist church groups have utilized the facilities of the College for workshops, conferences and sports. It grants honorary degrees to Methodists in disproportionate numbers, and Methodist officials, ministers and lay readers are invited to deliver commencement addresses, baccalaureate sermons and to speak in the "Supplementary Program."

There are references to God and the Church in Pfeiffer's charter, and there is a requirement that each candidate for its BA degree, the only degree it offers, have at least two courses in religion. It offers courses in sixteen academic fields, however, and every candidate for a degree must have had some courses in the humanities, in social sciences, and in natural sciences. The religion course requirement is part of the humanities requirement. Moreover, each candidate for a degree must have 125 credits, out of a minimum of 1,000 required for graduation, in its "Supplemental Program." That program includes offerings in cultural events, lectures and talks in a wide variety of topics, and religious services and programs. Religious services are offered regularly in the chapel, but attendance is not required, and the testimony shows that in the student body as a whole there is no unusual enthusiasm for Christian activities. Chapel attendance is poor.

Pfeiffer, however, does offer majors in religion, in Christian education and in church music. The religion major is designed for "pre-ministerial" students with the purpose of preparing them for graduate work in divinity schools. The majors in Christian education and in church music are designed to qualify graduates for careers in those fields. A student majoring in religion, in addition to required courses in religion and Christian education, is required to take courses in philosophy, English, history and a foreign language. In the student body there is a substantial number of pre-ministerial students, and a survey of Pfeiffer graduates indicated that 4.6% of them entered the ministry. Others are employed in other capacities in connection with religious work.

The courses in religion, but not those in Christian education or church music, are taught according to the academic requirements intrinsic to the subject matter. There is no evidence of attempts to propagate articles of Christian faith in those academic courses. Moreover, the religion re-

quirement can be satisfied by transfer credits from other colleges.

Pfeiffer has adopted the 1940 Statement of Academic Freedom of the American Association of University Professors. Each member of the faculty selects the materials to be used in his course, and there is no evidence that the United Methodist Church or any other religious group has attempted to influence the content of any course or the method by which it is taught.

In addition to the religious services sponsored by the College, on the campus there is a Christian Life Council which coordinates religious activities on campus, including Bible studies, retreats and other worship opportunities. Students provide other spontaneous worship opportunities for each other. However, on campus there are numerous other organizations with secular purposes providing students with opportunities for secular activities. There is no evidence that any member of the faculty or administration has attempted to interfere with the student government in any matter associated with religion, religious beliefs or activities.

There is no rule against prayer in the classroom, and, in the exercise of academic freedom, an individual professor may elect to open a class with prayer.

### III.

The criteria for determining the constitutionality of governmental aid to sectarian colleges are set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), where they were summarized:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; . . . finally, the statute must not foster "an excessive government entanglement with religion."

Here the plaintiffs concede that North Carolina's three scholarship and tuition assistance programs have a secular legislative purpose. We are left to consider the other two prongs of the test; the primary effect of advancing or inhibiting religion and excessive entanglement of government with religion.

As to the primary effect criterion, it was said in *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973):

[That] aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.

More specific guidelines are provided in *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), for the colleges here seem indistinguishable from the Catholic colleges involved in *Roemer*.

Maryland established a program of non-categorical grants to the state's private colleges, some of which had religious affiliations. In *Roemer* that program was challenged insofar as it provided grants to four Catholic colleges, the contention being that the colleges were "constitutionally ineligible for this * * * aid." A three-judge district court, after finding the facts extensively, concluded the four Catholic colleges were not "pervasively sectarian." The Supreme Court accepted the findings and agreed with the conclusion.

Among the characteristics of the Maryland colleges with which the Supreme Court was concerned in *Roemer* were the following:

(1) Despite their formal affiliation with the Roman Catholic Church, the colleges are 'characterized by a high degree of institutional autonomy.' 426 U.S. at 755, 96 S.Ct. 2337.

(2) The colleges employ Roman Catholic chaplains and hold Roman Catholic religious exercises on campus. Attendance at such is not required. *Id.*

(3) Mandatory religion or theology courses are taught at each of the colleges, primarily by Roman Catholic clerics, but

these only supplement a curriculum covering 'the spectrum of a liberal arts program.' *Id.* at 756, 96 S.Ct. 2337.

(4) Some classes are begun with prayer . . . . There is no 'actual college policy' of encouraging the practice. *Id.*

(5) Some instructors wear clerical garb and some classrooms have religious symbols. *Id.*

(6) Apart from the theology department, . . . faculty hiring decisions are not made on a religious basis. *Id.* at 757, 96 S.Ct. 2337.

(7) The great majority of students at each of the colleges are Roman Catholic, but . . . the student bodies 'are chosen without regard to religion.' *Id.*

■ As to those characteristics, there appears no material distinction between the Maryland colleges and Belmont Abbey and Pfeiffer College. In all of these schools there was a presence of religion, but each of them is a liberal arts college in which the inculcation of religion is not the primary purpose. Formal religious ties are present, but beyond the minimal requirement of courses in religion or theology, taught as academic exercises, religion is not forced upon the students. Their general liberal arts curricula are not designed to prepare students for service in a religious vocation, and students are neither required to accept a set of religious beliefs nor to practice religious rituals.

Since these colleges are not distinguishable from those with which the Supreme Court dealt in *Roemer*, we conclude that they are not so pervasively religious that their secular activities cannot be separated from their sectarian ones.

It would not be enough that the secular aspects of these institutions may be separated from the sectarian if the state specifically funded religious activities at these colleges. The North Carolina General Assembly not only has not undertaken to do that, it has imposed an express restriction that the funds be used only for secular educational purposes. The plaintiffs, however, question whether this has been observed in practice because both the Board of Governors and the North Carolina Educational Assistance Authority take the position that grants of student aid in the form of scholarships and tuition credits were, themselves, secular purposes so long as the aided student in an eligible college was not in a program of study designed as preparation for a career in a religious vocation.

When these funds are received from the state, the colleges have set them up in separate accounts for scholarship or tuition grants. Once the scholarships are awarded, however, and the scholarship and grant funds are credited to the accounts of the individual students, there is a bookkeeping transfer of the funds from the scholarship and tuition grant accounts to the general funds of the colleges. Since general funds are used to serve sectarian as well as the secular purposes of these colleges, the plaintiffs contend that *Roemer* is uncontrolling here.

■ This contention of the plaintiffs seems only a variant of the "recurrent argument" that secular aid indirectly but inevitably results in sectarian aid. This was clearly recognized in *Roemer* where it was said:

The Court has not been blind to the fact that in aiding a religious institution to perform a secular task, the State frees the institution's resources to be put to sectarian ends. 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179.

That fact, nevertheless, was held not to be a basis for invalidating the aid. It is enough that the state does not directly aid the sectarian activities and purposes. Consequential and incidental benefits that flow from state assistance in serving its secular mission are unavoidable, but they do not invalidate the secular aid extended by the state.

The scholarship and tuition grants with which we are concerned primarily benefit the eligible students and their families. It serves the state's secular purpose in assisting a North Carolina resident student to attend a private college of his choice. Since the schools here are not pervasively reli-

gious and the students receiving assistance are not preparing for a religious vocation, the grant of tuition and scholarship assistance to them is a secular use.

Of course, the colleges receive a benefit from these funds. Without such funds they might have fewer students, be able to charge less tuition, or be forced to divert other resources to student aid. In either such event, the receipt of these funds may be said to free other college funds for sectarian purposes which, otherwise, might not be available. That, however, is the precise reasoning which the Supreme Court held in *Roemer* was insufficient for First Amendment invalidation of the program.

The plaintiffs seem to concede that if, when the scholarships are awarded and the tuition credits made, the funds were transferred to restricted accounts for clearly defined secular purposes, the plans would be unassailable. Were that done, funds in the general account would be freed for sectarian use, funds which otherwise might not be available for those purposes. There is no difference in result, whether the transfer is to a restricted account or to the general fund.

Since a transfer of these funds to a restricted account would serve no useful practical purpose, it should be avoided, for policing the expenditure of such accounts would involve the state in the operation of the colleges to a greater extent than it now is. North Carolina is now "entangled" in the operation of these colleges only minimally. It requires a minimum number of reports and certificates, and the audits it has conducted have been short and objective. A requirement that the college keep its books on a basis which would disclose the ultimate use of the funds, and the state's auditing those accounts, would be a substantial increase in the state's involvement.

In considering whether Maryland was excessively involved in the operation of the Catholic colleges there, the Court in *Roemer* considered the characteristics and nature of the colleges, the form of the aid, the funding process and the potential for political divisiveness. Particular emphasis was placed upon the first factor.

Since we have determined that Belmont Abbey and Pfeiffer College are not pervasively sectarian, that the aid primarily benefits the students rather than the colleges, and that the funding process requires little state supervision, there is little need for extensive state surveillance of the secular activities being funded. As the Supreme Court noted in *Roemer*, secular activities, in general, may be funded without further inquiry, and we have found that scholarship grants and tuition credits to students are secular in purpose. Hence, we conclude that these programs are not constitutionally deficient because the state does not require bookkeeping disclosing the ultimate expenditure of all of the funds and state supervision of such bookkeeping.

Having concluded that these two colleges are not pervasively sectarian, that the state's purpose in providing the assistance is a secular one and the use of the funds is secular, and that there is no excessive entanglement of the state with religious activities, we conclude that these programs are unassailable under the First Amendment of the Federal Constitution.

McMILLAN, District Judge, concurring:

If we were writing on a clean slate, I would hold the challenged programs to be invalid as contrary to the First Amendment requirement that government "make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." Providing tax money to church supported schools to distribute for tuition is bound to have some effect upon the attitudes and practices of those schools in respect of religion. State subsidies started small but are increasing, and can before long, in furtherance of education, a perfectly legitimate state interest, become so large that the power to withdraw them will be the power to control the private schools they benefit.

Whether state aid tends to establish or *dis*establish religion is not material. The

far-sighted framers of the First Amendment were fresh witnesses to the dangers of dominion of church over state or of state over church, and wanted America to have none of either.

Unfortunately, the *Roemer* decision requires lower courts to make judgments as to *how much* religion a school actually *practices*; if the school atmosphere is essentially secular, *i. e.*, not "pervasively sectarian," the state can subsidize its students at will.

Judged by the *Roemer* standard, Pffeifer and Belmont Abbey are eligible for the state programs in question. The evidence at the hearing demonstrates that despite their many trappings and insignia of religious orientation these schools are not "pervasively" religious in profession or practice; religion there is described as an "intellectual discipline" with humanistic overtones; and these private schools do little if any more to promote religion than do the state supported schools whose public sources of funds they avidly seek to tap.

On further reflection perhaps this is the only way church schools can survive; youth today does not appear to take to formal religious indoctrination any more readily than it did in former centuries. It is, however, disquieting to one who attended one church school, Presbyterian Junior College, helped organize another, St. Andrews, and, in a small way has helped support church schools for many decades, and who has long thought and still believes that their offerings to a busy world are worth preserving.

I agree completely with the Court's thorough, clear and accurate analysis of the facts and with the legal conclusions drawn from those facts, and with the view that the Belmont Abbey and Pffeifer situations can not be distinguished meaningfully from the situations dealt with in the *Roemer* case; and I agree that we are bound by that decision today.

Solely, therefore, in deference to what I consider to be controlling authority, but with tremendous reluctance in principle, I concur in the decision.