# Department of Housing and Urban Development Restrictions on Grants to Religious Organizations That Provide Secular Social Services

The Establishment Clause of the Constitution does not require the Department of Housing and Urban Development to deny grants to religious organizations that engage in religion-based employment discrimination or to deny grants for rehabilitation, reconstruction, or construction of facilities that are owned by religious organizations.

Department of Housing and Urban Development prohibition on use of grant funds for religious counseling or use of grant funds to provide services in a facility in which sectarian or religious symbols are displayed is not more restrictive than the Establishment Clause requires.

September 14, 1988

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
CIVIL RIGHTS DIVISION

## Introduction and Summary

This memorandum responds to your request for our opinion on whether certain regulations of the Department of Housing and Urban Development restrict the participation of religious organizations in the Community Development Block Grant ("CDBG") and Emergency Shelter Grant programs to a greater degree than is required by the Constitution. According to Mike Antonovich, Chairman of the Board of Supervisors of Los Angeles County, these regulations are keeping the Salvation Army from obtaining a Community Development Block Grant to provide emergency shelter and food to the homeless. In a memorandum ("Memorandum") submitted to you last November, Frank Atkinson suggested that HUD's ban on religious counseling exceeds Establishment Clause requirements and may transgress the Free Exercise Clause. The Memorandum therefore recommended that the Legal and Regulatory Policy Working Group develop an administration policy to enable religious organizations to participate in the delivery of government-assisted social services to the maximum extent permissible under the First Amendment.

The restrictions to which the Salvation Army objects are generally not embodied in formal rules, but rather are contained in an addendum that HUD requires as part of its grant agreement with religious organizations. The addendum states that the grantee agrees (1) not to discriminate against any employee or applicant for employment on the basis of religion in connection with the program

190

receiving the grant,[1] (2) not to discriminate on the basis of religion in the provision of funded services, (3) not to provide any religious instruction or counseling in connection with the program[2], and (4) not to display any sectarian or religious symbols or decorations in any portion of the facility used to conduct the program. The addendum further provides that no federal funds may be used to construct, rehabilitate, or restore any facility owned by a religious organization, except that "minor repairs" that are directly related to the provision of public services and that constitute in dollar terms only a minor portion of the federal grant may be made to a facility used exclusively for non-religious purposes.

For the reasons stated below, we believe that HUD's addendum interferes with religious organizations' ability to participate in the CDBG program in several respects not mandated by the Establishment Clause. First, we believe neither the Constitution nor the applicable statutes require religious organizations to refrain from discrimination on the basis of religion in employment as a condition of their receipt of funds under the Community Development Block Grant program. We also believe that the restriction on the use of federal funds to construct, rehabilitate, or restore facilities owned by religious organizations is more severe than current jurisprudence under the Establishment Clause requires. So long as religious organizations agree to dedicate facilities constructed, rehabilitated or restored with federal funds to secular purposes in perpetuity, the strictures mandated by Establishment Clause jurisprudence are satisfied. Finally, the prohibitions of religious instruction or counseling and religious symbols are acceptable so long as they are reasonably interpreted in light of the facts of each case. *See infra* note 17 and accompanying text.

After analyzing these restrictions under current Establishment Clause jurisprudence we review the Supreme Court's recent decision in *Bowen v. Kendrick*, 487 U.S. 589 (1988) and discuss its general implications for the participation of religious organizations in secular social welfare programs.

## Analysis

### A. *Amos Case and HUD's Restrictions Prohibiting Discrimination in Employment*

In *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 438 U.S. 327 (1987), the Supreme Court upheld against

---

[1] In addition to this provision of the addendum, HUD's formal regulations for the Community Development Block Grants program require grantees "to document the actions undertaken to assure that no person, on the ground of race, color, national origin, religion, or sex, has been excluded from participation in, denied the benefits of, or otherwise subjected to discrimination under any activity funded under this part." 24 C.F R. § 570.900(c)(1) (1988); *see also* 49 Fed. Reg. 43,852, 43,899 (1984) (to be codified at 24 C F.R. § 570.904(a)) (proposed Oct. 31, 1984).

[2] The HUD addendum provides that the grantee "agrees that, in connection with such public services[,] . . . it will provide no religious instruction or counseling, conduct no religious worship or services, engage in no religious proselytizing, and exert no other religious influence in the provision of such public services."

an Establishment Clause challenge an exemption from title VII's ban on religious discrimination in employment for "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* at 330 n.1. Specifically, the Court held that exemption satisfied the three-part test set out in *Lemon v. Kurtzman,* 403 U.S. 602 (1971), for determining whether government assistance to religion is permissible under the Establishment Clause. The Court held that the law passed muster under the first prong of the *Lemon* test, which requires that legislation serve a secular purpose, because its purpose was to limit governmental interference with the exercise of religion. *Id.* at 335–36. The Court held that the exemption did not have the primary purpose of advancing religion, and thus passed the second prong of the *Lemon* test, because it did not increase the capacity of religious institutions to propagate their religion beyond that which the institutions possessed prior to enactment of title VII. *Id.* at 337. Finally, the Court concluded that the statute did not impermissibly entangle church and state, the third prong of the *Lemon* test, because it effected a complete separation between churches and title VII. *Id.* at 339.

*Amos* establishes that the Constitution permits an exemption for religious organizations from an otherwise generally applicable prohibition on religious discrimination in employment and therefore suggests that HUD is not constitutionally obligated to require grantees to refrain from religious discrimination in hiring. *Amos,* however, does not conclusively resolve the issue of whether HUD's regulation prohibiting religious discrimination in employment is required by the Establishment Clause, because *Amos* does not address whether an organization that practices religious discrimination in employment is a "pervasively sectarian" institution and therefore more likely to be ineligible to receive government financial assistance under current Supreme Court caselaw.[3] Although we have found

---

[3] We do not believe that *Amos* itself implies that there is an identity between the class of institutions that are characterized as "pervasively sectarian" under the Establishment Clause and those that qualify for the exemption. The exemption at issue in *Amos* applied to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1. Nothing in the language of the statute suggests that the exemption is available only to those religious organizations that are characterized "pervasively sectarian" as a matter of constitutional jurisprudence. *See, e.g., Hunt v McNair,* 413 U S 734, 743 (1973) (referring to "pervasively sectarian" institutions as those "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission"). Indeed, since the only institutions that have actually been held to be "pervasively sectarian" are parochial schools, equating "religious" with "pervasively sectarian" would appear substantially to narrow the scope of the exemption.

The facts of the *Amos* case itself indicate that the exemption is available to religious organizations that are not "pervasively sectarian." The individual whose case was before the Supreme Court was employed as a building engineer at the Deseret Gymnasium, a non-profit facility operated by the Mormon Church 183 U S. at 330. The district court had specifically found that "there is nothing in the running or purpose of Deseret that suggests that it was intended to spread or teach the religious beliefs and doctrine and practices of sacred ritual of the Mormon Church or that it was intended to be an integral part of church administration. Rather, its primary function is to provide facilities for physical exercise and athletic games. Deseret is open to the public for annual membership fees or for daily or series admission fees." *Amos v Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints,* 594 F. Supp. 791, 800–01 (D Utah 1984) (footnotes omitted), *modified,* 618 F Supp. 1013

192

no case in which this question is squarely presented, we believe the fact that an organization practices religious discrimination in hiring does not preclude government financial assistance in a manner otherwise compatible with the Establishment Clause.

There is no precise definition of a "pervasively sectarian" institution. In *Hunt v. NcNair*, 413 U.S. 734 (1973), the Court referred to institutions "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Id.* at 743. In *Roemer v. Maryland Public Works Board*, 426 U.S. 736 (1976), the Court defined a "pervasively sectarian" institution somewhat tautologically as an institution "so permeated by religion that the secular side cannot be separated from the sectarian." *Id.* at 759.[4]

In practice, the concept of the "pervasively sectarian" institution has been applied only in the context of aid to church-related schools. Courts have generally found that church-related elementary and secondary schools are "pervasively sectarian," while most post-secondary institutions have been deemed sufficiently secular to permit government assistance. In making these determinations, courts have looked at a variety of factors, including the degree of control by religious organizations, whether the school or its curriculum has the purpose of teaching and promoting a particular religious faith, whether there are religious restrictions on admission to the school, whether there are required courses in theology or religious doctrine, whether participation in religious exercises is required, and whether the school is an integral part of the sponsoring organization's religious mission.[5] In particular, two appellate courts have considered restrictions or pref-

---

[3] (. . . continued)

(D. Utah 1985), *rev'd*, 483 U.S. 327 (1987). The Supreme Court never disputed these findings of the district court Indeed, the only reference in the majority opinion to the religiosity of the Deseret Gymnasium was a quotation from the Dedicatory Prayer offered at the opening of the facility "[may] all who assemble here, and who come for the benefit of their health, and for physical blessings, may feel that they are in a house dedicated to the Lord." 483 U.S. at 337. Based on the evidence adduced by the Supreme Court, the Deseret Gymnasium does not appear to be a "pervasively sectarian" institution under Establishment Clause jurisprudence

[4] In addition to the lack of a precise definition of "pervasively sectarian" institution, members of the Court differ with respect to the significance of such a determination For example, Justice Kennedy, in his concurring opinion in *Bowen* for himself and Justice Scalia, indicates some skepticism about the utility of the "pervasively sectarian" concept. "The question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant." 487 U.S. at 624–25. The separate concurrence of Justice O'Connor as well suggests that the proper inquiry is whether any public funds have been used to promote religion 487 U.S. at 622. Even Justices Blackmun, Brennan, Marshall, and Stevens in dissent in *Bowen* indicated that "the Constitution does not prohibit the government from supporting secular social-welfare services solely because they are provided by a religiously affiliated organization " 487 U.S. at 640 Significantly for the matter under review, the dissent stated "[t]here is a very real and important difference between running a soup kitchen or a hospital, and counseling pregnant teenagers " *Id.* at 641. Thus, the dissent suggests the importance of evaluating the substantive nature of the use of public funds. Confusingly, the dissent also indicated that the label "pervasively sectarian" may serve in some cases as a proxy for a more detailed analysis of the institution, the nature of the aid, and the manner in which the aid may be used. *Id* at 633, *see also Roemer v Maryland Pub. Works Bd* , 426 U S. 736, 758 (1976).

[5] *See, e g., Felton v Secretary, United States Dep't of Educ.*, 739 F 2d 48 (2d Cir. 1984), *aff'd sub nom. Aguilar v. Felton*, 473 U.S. 402 (1985).

erences in hiring as one factor that may be indicative of a "pervasively sectarian" institution.[6]

We do not believe, however, that these cases establish that any organization providing social services that limits employment opportunities to adherents of a single faith is "pervasively sectarian." Again, the only entities which have been found by the courts to be "pervasively sectarian" are parochial schools. In contrast, religiously affiliated colleges—even those that grant preference in admissions or hiring to members of the sponsoring faith—have generally not been deemed pervasively sectarian. *See Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736 (1976); *Hunt v. McNair*, 413 U.S. 734 (1973); *Tilton v. Richardson*, 403 U.S. 672 (1971). Moreover, even those members of the Court more apt to find an institution to be pervasively sectarian have indicated that the Establishment Clause poses fewer obstacles to the involvement of religious organizations when the activity is not aimed at the "shaping [of] belief and changing behavior," but "neutrally dispensing medication, food or shelter."[7] We therefore believe that the few cases ascribing significance to discrimination in hiring by parochial schools in determining whether such schools are "pervasively sectarian" are of limited relevance when applied to the subject under review.[8]

Nor does any statute require HUD to prohibit CDBG grantees from limiting employment opportunities on the basis of religion. The statute creating the CDBG program, title I of the Housing and Community Development Act of 1974, Pub. L. No. 93–383, 88 Stat. 633 (codified as amended at 42 U.S.C. §§ 5301–5320), does not require prohibition of religious discrimination in employment.[9] More-

---

[6] The Second Circuit held that parochial schools receiving title I assistance were "pervasively sectarian" because, inter alia, they were part of a "system in which religious considerations play a key role in the selection of students and teachers, and which has as its substantial purpose the inculcation of religious values." *Felton v. Secretary, United States Dep't of Educ.*, 739 F 2d 48, 68 (2d Cir 1984), *aff'd sub nom. Aguilar v Felton*, 473 U.S. 402 (1985); *see also Cuesnongle v. Ramos*, 713 F.2d 881, 883 (1st Cir. 1983) (attributes of a "pervasively sectarian" institution include religion-based admission policies).

[7] *Bowen v. Kendrick*, 487 U S. 641 (1988) (Blackmun, J., dissenting)

[8] The Memorandum for John J Knapp, General Counsel, Department of Housing and Urban Development, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 1, 1983) ("Olson Memorandum") which stated that "[A]n institution that grants preferences to members of a particular creed would by definition be a pervasively sectarian organization," Olson Memorandum at 19, is not to the contrary. That comment was made in the context of religious discrimination among potential beneficiaries of government-funded social service programs. While that comment may at some point require re-examination, we need not here reach the constitutional issue of whether discrimination among beneficiaries makes an institution "pervasively sectarian," because, as discussed below, the statute creating the CDBG program prohibits religious discrimination in the provision of services. *See infra* note 10.

[9] Section 109 of the 1974 Act (42 U.S.C. § 5309) provides that "[n]o person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under this chapter," but does not forbid religious discrimination Section 104(b)(2) of the Act (42 U.S.C § 5304(b)(2)) further requires grantees to certify that their grants "will be conducted and administered in conformity with Public Law 88–352 and Public Law 90–284." Public Law No. 88–352 is the Civil Rights Act of 1964, 78 Stat 241 (codified as amended at 28 U S.C. § 1447, 42 U.S.C. §§ 1971, 1975a-1975d, 2000a-2000h-6), and Public Law No. 90–284 is the Civil Rights Act of 1968, 82 Stat. 73 (codified as amended in scattered sections of 18 U.S.C., 42 U.S C , 25 U.S.C. §§ 1301–1341, 28 U.S.C. § 1360 note). No provision of the latter act relates to discrimination in employment.

over, although title VI of the Civil Rights Act of 1964 contains a general prohibition of discrimination in federally assisted programs on the ground of race, color, or national origin, 42 U.S.C. § 2000d, religious discrimination is not prohibited.[10]

The only other arguably relevant provision of the 1964 Act is title II, the public accommodations provision, which provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). Although barring religious discrimination by places of public accommodation, this section does not apply to the employment practices of such establishments but only to their provision of services. Accordingly, it appears that the Housing and Community Development Act of 1974, whose certification provision incorporates by reference the Civil Rights Acts of 1964 and 1968, does not require religious organizations to refrain from religious discrimination in employment in connection with activities funded under the Act.[11]

We therefore conclude that the Constitution not only permits the granting of an exemption to religious organizations from otherwise applicable prohibitions on religious discrimination in employment, but also that it permits government financial assistance to the organizations so exempted.[12] The act creating the block grant program does not require a prohibition on religious discrimination in hiring. Since HUD's regulations flatly prohibit this form of religious discrimination by grantees, they are more restrictive than required by law.

## B. HUD's Restrictions Prohibiting Rehabilitation, Restoration and Construction Funds for Religious Organizations

The HUD regulations that prohibit use of federal funds to construct, rehabilitate, or restore any facility that is owned by a religious organization are also more restrictive than is constitutionally required. It is clear that there is no per se exclusion of religious institutions from the receipt of government aid under certain circumstances. As the Court has stated, "[r]eligious institutions need not be quarantined from public benefits that are neutrally available to all." *Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736, 746 (1976).

---

[10] Title VII of the 1964 Act does forbid discrimination, including religious discrimination, in employment, but also contains the exemption for religious organizations upheld in *Amos.* 42 U.S.C. § 2000e-1

[11] The same is not true of religious discrimination in the provision of funded social services. Title II of the Civil Rights Act of 1964, as indicated in the text, prohibits religious discrimination in places of public accommodation. Shelters appear to be places of public accommodation under the statute, since they constitute an "inn, hotel, motel, or other establishment which provides lodging to transient guests." 42 U S.C. § 2000a(b)(1). Other types of social service facilities may or may not fall under the statutory definition of places of public accommodation.

[12] It is also clear that mere receipt of government financial assistance will not transform the religious organization into a state actor subject to constitutional prohibitions on religious discrimination. *Rendell-Baker v Kohn*, 457 U.S. 830 (1982) (fact that public funds constituted between 90 and 99 percent of private school's budget did not satisfy under color of law requirement of 42 U.S.C. § 1983); *see also Blum v Yaretsky*, 457 U.S. 991 (1982); *Jackson v Metropolitan Edison Co.*, 419 U S 345, 350–53 (1974).

While the Court's recent decision in *Bowen* casts some doubt on the breadth or significance of the label "pervasively sectarian,"[13] the Court has in the past distinguished between those religious institutions that are "pervasively sectarian" and those that are not.[14] Government assistance to a "pervasively sectarian" religious institution has been generally thought to have the primary effect of advancing religion, *Hunt v. McNair*, 413 U.S. 734, 743 (1973), and therefore fail the second prong of the *Lemon* test. However, as discussed above, not all religious institutions are "pervasively sectarian," and the Court has sustained direct financial assistance to church-affiliated organizations, provided the three-part *Lemon* test is satisfied. *Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736 (1976) (aid to church-affiliated college); *Hunt v. McNair*, 413 U.S. 734 (1973) (same); *Tilton v. Richardson*, 403 U.S. 672 (1971) (same); *Bradfield v. Roberts*, 175 U.S. 291 (1899) (aid to hospital operated by religious order).

The seminal modern case on the permissibility of government assistance to religious institutions qua institutions is *Tilton v. Richardson*, 403 U.S. 672 (1971). Earlier cases such as *Everson v. Board of Educ.*, 330 U.S. 1 (1947), and *Board of Educ. v. Allen*, 392 U.S. 236 (1968), had upheld the constitutionality of public assistance in the context of parochial schools on the theory that the aid went to the students, not to the schools themselves. "The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." *Everson v. Board of Educ.*, 330 U.S. at 18. "[N]o funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." *Board of Educ. v. Allen*, 392 U.S. at 243–44. *Tilton* is the first modern case to permit direct financial assistance to religious institutions.[15]

In *Tilton* the Supreme Court upheld the constitutionality of awarding construction grants under the federal Higher Education Facilities Act of 1963 to church-related colleges and universities. The Act established a program, administered by the Commissioner of Education, to provide grants and loans to institutions of higher education for the construction of academic facilities. The Act specifically excluded

---

[13] *See supra* note 5

[14] This Office has already repudiated any inference from the Olson Memorandum that organizations such as the Salvation Army, B'nai B'rith, and the Young Men's Christian Association are "pervasively sectarian." *See* Letter for Stuart C. Sloame, Deputy General Counsel, Department of Housing and Urban Development, from Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 1, 1986) ("Kmiec letter"), *reprinted in HUD's Proposed Regulations Denying Funds to Religious Groups for Sheltering the Homeless  Hearings Before a Subcomm of the House Comm. on Government Operations*, 100th Cong., 1st Sess. 111–12 (1987).

[15] An intermediate case bridging the student benefit cases and the direct aid cases is *Walz v. Tax Comm'n*, 397 U.S 664 (1970)  There the Court sustained the constitutionality of a property tax exemption for property owned by religious organizations. Although a tax exemption is the economic equivalent of a subsidy, as the Court has recognized in other contexts, *see Regan v. Taxation With Representation of Washington*, 461 U S. 540, 544 (1983)("Both tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income."), the Court in *Walz* clearly distinguished tax exemptions from subsidies for purposes of legal analysis "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." 397 U.S at 675.

from eligibility for federal financing, however, "any facility used or to be used for sectarian instruction or as a place for religious worship."

The Court found that the Act clearly had a legitimate secular purpose, namely encouraging and assisting colleges and universities to expand opportunities for higher education. A more difficult question was whether the Act, despite its legitimate secular objective, nevertheless had the primary effect of advancing religion. The Court noted that "[T]he simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago in *Bradfield v. Roberts*, 175 U.S. 291 (1899)." *Tilton v. Richardson*, 403 U.S. 672, 679 (1971). The Court then proceeded to examine the use of federal assistance by the recipient institutions to determine whether the program had the effect of advancing religion.

The Court found that the Act "was carefully drafted to ensure that the federally subsidized facilities would be devoted to the secular and not the religious function" of the grantee. *Id.* at 679. The colleges whose grants were before the Court had scrupulously observed these restrictions and presented uncontradicted evidence that "there had been no religious services or worship in the federally financed facilities, that there are no religious symbols . . . in or on them, and that they had been used solely for nonreligious purposes." *Id.* at 680. On this basis the Court concluded that the federally funded buildings were "indistinguishable from a typical state university facility." *Id.*

Moreover, the Court found that, unlike elementary and secondary parochial schools, religious indoctrination was not a substantial purpose or activity of church-related colleges. *Id.* at 680, 681. Accordingly, "there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education." *Id.* at 687. That in turn "reduces the risk that government aid will in fact serve to support religious activities," thereby diminishing the need for intensive government surveillance and reducing to an acceptable level the entanglement between government and religion. *Id.*[16] The Court therefore concluded that the inclusion of church-related schools in the grant program did not violate the Establishment Clause.

*Hunt v. McNair* and *Roemer v. Maryland Public Works Board* involved similar programs at the state level. At issue in *Hunt* was a South Carolina statute that provided for the issuance of revenue bonds by a state authority to finance facilities at colleges and universities. The Court rejected a facial challenge to the participation of church-related colleges in the program for the same reasons set forth in *Tilton*.

In *Roemer* the Court upheld the constitutionality of noncategorical grants to church-related colleges, so long as the grants were not used for sectarian purposes. Justice Blackmun's plurality opinion in *Roemer* is perhaps the most forceful statement of the propriety of allowing religious organizations to participate in secular assistance programs. Recognizing the impossibility of any "hermetic separation" between church and state, Justice Blackmun noted that "[i]t long has

---

[16] The Court also found that the Act did not violate the Free Exercise rights of taxpayers who objected to the grants to church-related schools 403 U S at 689.

been established . . . that the State may send a cleric, indeed even a clerical order, to perform a wholly secular task." *Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736, 746 (1976). The Court not only rejected the notion that "a religious person can never be in the State's pay for a secular purpose," it suggested that exclusion because of religion would itself be unconstitutional. *Id.* at 746 & n.13. *Tilton, Hunt,* and *Roemer* make it clear that a religious organization may participate in public programs of a secular nature on the same basis as nonsectarian organizations. The determinative factor for Establishment Clause purposes is not the religious nature of the facility's owner but the uses to which the facility is put. So long as a facility is used for secular purposes, and is permanently dedicated to those purposes, the Constitution permits governmental aid, even though the facility is owned by a religious institution. *Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736 (1976); *Hunt v. McNair*, 413 U.S. 734 (1973); *Tilton v. Richardson*, 403 U.S. 672 (1971); *Bradfield v. Roberts*, 175 U.S. 291 (1899).[17]

---

[17] HUD itself apparently now recognizes "the vital and unique role religious organizations play in providing for individuals in need of shelter and other public assistance." 52 Fed. Reg. 38,864, 38,868 (1987) In its recently promulgated regulations for the Emergency Shelter Grants Program, HUD announced that federal funds can be used to renovate buildings owned by religious organizations if (1) the building or portion thereof that is to be improved with HUD funds is leased to a wholly secular entity, (2) the HUD funds are provided solely to the secular lessee, (3) the leased premises are used exclusively for secular purposes and are available to all persons regardless of religion, (4) the lease payments do not exceed the fair market rent of the premises before the improvements are made, (5) the portion of the cost of any improvements that also serve non-leased areas of the building is allocated to and paid by the lessor, (6) the lessor agrees that, unless the lessee or another secular successor retain the leased premises for wholly secular purposes for at least the useful life of the improvements, the lessor will pay to the lessee an amount equal to the residual value of the improvements, and (7) the lessee permits any payments for the residual value of improvements to the State or local government agency that made the original grant, or to HUD in the case of a direct grant. 52 Fed. Reg. 38,864, 38,870 (1987) (to be codified at 24 C.F.R. § 575.21(b)(2)).

We believe that the leasing arrangement required by the regulations is not constitutionally necessary and therefore should not be mandated by HUD. It is clear that religious organizations may participate on an equal footing with secular organizations in general assistance programs. The Supreme Court has recently reaffirmed this principle, noting that "this Court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Bowen v. Kendrick*, 487 U.S. 589, 608 (1988). Leasing arrangements under the terms specified in the HUD regulations might enhance the acceptability, however, of a religious organization running a homeless shelter under the Emergency Shelter grant program within a highly sectarian structure like a church building. The leasing provisions might be prudentially retained, therefore, but with the qualification that they apply only where a religious organization wishes to utilize space within a highly sectarian building of this variety.

This is not to state that such leasing arrangements are constitutionally required even in this context. Given the Court's newly-expressed preference to review Establishment Clause challenges on an as-applied, rather than facial, basis, and the suggestion by even the dissenting members of the Court in *Bowen v. Kendrick* that "soup kitchen"-like functions are more tolerably supplied by religious organizations, it may be that the Court would sustain the operation of a publicly-funded emergency homeless shelter even, perhaps, in the Church proper, despite the presence of permanently affixed religious symbols therein, provided the shelter was operated without religious counseling or in a manner designed to inculcate the views of religious faith. The willingness of the Court to accept the use of such a facility will likely depend, however, on the severity of the particular emergency housing need and the willingness of the church to demonstrate clearly that only secular assistance will be provided. The point is simply that the Court has indicated that Establishment Clause principles ought not be applied in a sweeping, mechanical fashion. Moreover, where a recipient of public funds has applied them in a manner inconsistent with the Clause, "an appropriate remedy would require the Secretary to withdraw [grant approval for that recipient]." 487 U S. at 621

Despite the somewhat more generous attitude displayed by HUD's shelter regulations, we are informed that HUD still requires grantees under both the Community Development Block Grant and Emergency Shelter Grant programs to execute the special addendum to the grant agreement.

## C. HUD's Prohibitions on Religious Counseling and Religious Symbols

On its face, HUD's prohibition on religious counseling and religious symbols would not appear to be more restrictive than required by the Establishment Clause. The Supreme Court's Establishment Clause cases presuppose that government is providing secular assistance to be used for only secular purposes.

Although it is clear beyond peradventure that the government cannot subsidize religious counseling by the Salvation Army, there is nothing precluding HUD from subsidizing the Army's secular program for the homeless (food and shelter) if it can be meaningfully and reasonably separated from the Army's sectarian program (religious counseling). Constitutional difficulty only arises when the secular component is inseparable from the sectarian component to permit government assistance.

Thus, as a constitutional matter the Salvation Army cannot undertake religious counseling with public funds; however, it can accept public funds to provide food and shelter. If the facility used for the shelter program was not constructed, renovated, or maintained with public funds, it is theoretically possible for a portion of the facility to be used exclusively for the publicly-funded secular purpose of food and shelter and another portion to be used for the non-publicly funded sectarian purpose of religious counseling. Beyond this physical separation, HUD need only ensure that the Army's privately-funded religious activities are not offered as part of its shelter program and that the shelter program is not used as a device to involve the homeless in religious activities.[18] Assuming these conditions were met, the Salvation Army could both participate in the CDBG or Emergency Shelter Grant programs and fulfill its religious mission using a single facility.[19]

## D. Bowen v. Kendrick

The Supreme Court's recent decision in *Bowen v. Kendrick*, 487 U.S. 598 (1988), upholding the participation of religious organizations in federally funded counseling programs under the Adolescent Family Life Act, Pub. L. No. 97–35, tit. IX, 95 Stat. 578 (codified as amended at 42 U.S.C. §§ 300z to 300z-10), reconfirms the analysis set forth above. Specifically, *Kendrick* makes it clear that religious organizations may participate in government-funded social welfare programs so long as they engage in only purely secular activities. *Kendrick* thus sup-

---

[18] The Court's recent decision in *Bowen v. Kendrick* indicates that outside of the parochial school context the monitoring necessary to ensure this separation will not entail excessive entanglement between church and state. 487 U.S. at 615–16.

[19] Moreover, we believe that HUD's addendum on religious counseling may be construed to permit such use, because if religious counseling is kept completely separate from the publicly funded services it is not "connected" with those services within the meaning of the addendum. Of course, if the facility was constructed, renovated, or maintained with public funds, then no religious activities could be permitted therein. However, it may be permissible to use public funds to construct, renovate or maintain a separable portion of the facility that would be permanently and exclusively devoted to secular activities. HUD's regulations for the Emergency Shelter Grant program contemplate this possibility. *See supra*, note 17.

199

ports our conclusion that the Salvation Army may receive federal funds for the purpose of sheltering the homeless.

At issue in *Kendrick* were grants awarded under the Adolescent Family Life Act ("AFLA") to religious organizations for counseling teenagers in the areas of adolescent premarital sexual relations, pregnancy, and parenthood. The Court firmly rejected the claim that the mere participation of religious organizations as grantees under AFLA was unconstitutional. Relying on a long line of cases upholding government assistance to religious organizations dating back to 1899, the Court disavowed the notion that "religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Bowen v. Kendrick*, 487 U.S. 589, 609 (1988). So long as the assistance does not have the effect of advancing religion, religious institutions may participate in general social welfare programs on an equal footing with secular organizations.

The Court also disagreed with the claim that government funding of religious organizations in activities, even though otherwise purely secular, that involved fundamental matters of religious doctrine created a "symbolic link" between church and state that violated the Establishment Clause. *Id.* at 613. The Court noted that acceptance of this argument would always preclude any aid to religious organizations. *Id.* at 613.

Moreover, the Court squarely rejected the argument that funding such organizations under AFLA may lead to an "excessive government entanglement with religion" and thus violate the third prong of the *Lemon* test. *Id.* at 615. Noting that this prong of the *Lemon* test had been much criticized over the years, the Court explained that cases that had found entanglement had involved aid to parochial schools, which were "pervasively sectarian" and had "as a substantial purpose the inculcation of religious values." *Id.* at 616. In contrast, the Court noted that there was no reason to assume that the religious organizations eligible for AFLA funds are pervasively sectarian and thus no reason to fear that the kind of monitoring required will lead to excessive entanglement. *Id.*

The Court's opinion in *Kendrick* thus stands for several important propositions. First, it makes clear that religious organizations may fully participate in government social programs even when these programs include moral teaching. A fortiori, religious organizations are eligible to participate in the provision of government-subsidized care for the poor. Second, the Court's opinion seems to signal a relaxation of the entanglement prong of the *Lemon* test. Unless the institutional context in which the religious organization operates is so pervasively sectarian as to be akin to a parochial school, the government will be permitted to monitor religious organizations to assure that public money is spent in a constitutional manner.[20]

---

[20] We believe that the Supreme Court's conclusion with respect to excessive entanglement in *Kendrick* fatally undermines the Olson Memorandum's argument that, in order to avoid excessive entanglement, religious organizations could participate in the section 202 program only through separate, nonreligious entities The memorandum reasoned that participation by religious organizations in the section 202 program would require a degree of "administrative oversight [that] would necessarily involve an excessive government entanglement with religion." Olson Memorandum at 13.

On the other hand, *Kendrick* did not address the degree to which and the means by which organizations must keep separate their religious activities from the activities funded by the government. Because the Supreme Court decided only the facial validity of the statute, leaving the validity of the statute as applied to the district court on remand, *Kendrick* provides little guidance on the issue of the degree of separation required between the government-funded secular activities and the privately funded sectarian activities of a religious grantee. It is clear, however, that at least some of the religious grantees did not maintain the constitutionally required separation between their religious mission and their secular function under AFLA. The Government's brief in Kendrick conceded that there were "departures from proper constitutional principles in individual AFLA programs," Brief for the Appellant at 40, *Bowen v. Kendrick*, 487 U.S. 589 (1988), and the Court explicitly acknowledged that "the record contains evidence of specific incidents of impermissible behavior by AFLA grantees." 487 U.S. at 620.[21] Accordingly, *Kendrick* does not in any way establish that religious organizations may use public funds in connection with promotion of religious views or practices. The Supreme Court has ruled only that religious organizations may participate on an equal basis in secular government assistance programs; *Kendrick* does not suggest that the Court would be amenable to relaxing the degree to which these organizations must separate their religious functions from their government-funded secular activities.

## Conclusion

For the reasons set forth in this memorandum, we believe that HUD's grant prohibitions on religious discrimination in employment and its limitation on grants for rehabilitation, restoration or construction of facilities owned by religious organizations but devoted to secular purposes are not required by the Constitution. We do not believe that HUD's addendum prohibitions of religious counseling and religious symbols are more restrictive than the Establishment Clause requires so long as they are reasonably applied. Finally, the prohibition relating to discrimination against program beneficiaries is consistent with constitutional and statutory requirements.

DOUGLAS W. KMIEC
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[20] (. . continued)

*Kendrick* is clearly to the contrary. If the Court rejected an excessive entanglement attack in the context of a program such as AFLA, which involved counseling of adolescents on secular matters which frequently coincided with religious values, a fortiori it would not sustain such an attack in the context of a program that provided non-pedagogical assistance with no religious connotation, such as food, clothing, and shelter. For a disavowal of an expansive interpretation of the Olson Memorandum's concept of "pervasively sectarian," see the Kmiec letter at note 15.

[21] The district court had found that at least one grantee had included "*spiritual counseling*" *as part of its services*, that numerous grantees conducted their programs in facilities adorned with religious symbols, and that several grantees had presented privately funded religious counseling immediately after the government-funded AFLA counseling. *Kendrick v. Bowen*, 657 F. Supp. 1547, 1566 (D.D.C. 1987)