Larry ZOBREST; Sandra Zobrest, husband and wife; James Zobrest, a minor, by Larry and Sandra Zobrest, his parents, Plaintiffs–Appellants,

v.

CATALINA FOOTHILLS SCHOOL DISTRICT, Defendant–Appellee.

No. 89–16035.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1990.

Decided May 1, 1992.

William Bentley Ball, Ball, Skelly, Murren & Cornell, Harrisburg, Pa., Thomas J. Berning, Ariz. Center for Law in the Public Interest, Tucson, Ariz., for plaintiffs-appellants.

John C. Richardson, DeConcini, McDonald, Brammer, Yetwin & Lacy, Tucson, Ariz., for defendant-appellee.

Before: TANG, FLETCHER, and REINHARDT, Circuit Judges.

## OPINION

FLETCHER, Circuit Judge:

The Zobrests appeal the district court's ruling that provision of a state-paid sign language interpreter to James Zobrest while he attends a sectarian high school would violate the Establishment Clause. The Zobrests also argue that denial of such assistance violates the Free Exercise Clause.

We affirm.

## BACKGROUND

James Zobrest is a student at Salpointe Catholic High School. He is profoundly deaf, qualifying him as a handicapped child under the Federal Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1401(a)(1), and Ariz.Rev.Stat. § 15–761(6); *see also* 34 C.F.R. § 300.5. The EHA provides federal funds to state and local governments for the purpose of educating handicapped children. *Board of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). In order to obtain federal funds, a state must offer all handicapped children within its jurisdiction a "free appropriate public education." 20 U.S.C. § 1412(1). Under the program, states and school districts provide handicapped students the services necessary to meet their special educational needs. 20 U.S.C. § 1413(a)(4)(A). Arizona has enacted a statutory scheme designed to

meet the educational needs of its handicapped students and to qualify it for federal assistance under the EHA. Ariz.Rev. Stat. §§ 15–761 to 15–772.

■ Both EHA and state funds are available to provide sign language interpreters. *See* 34 C.F.R. § 300.13. The parties do not dispute that James needs the assistance of a sign language interpreter in the classroom. The parties have also agreed that, if James attended either a public or a non-religious private school in Arizona, the Catalina Foothills School District ("School District") would assume full financial responsibility for the employment of a sign language interpreter for James.[1]

Salpointe High is a private Roman Catholic school, operated by the Carmelite Order of the Catholic Church. Salpointe is a pervasively religious institution; religious themes permeate the classroom. According to the parties' stipulation of facts, "[t]he two functions of secular education and advancement of religious values or beliefs are inextricably intertwined throughout the operations of Salpointe." Salpointe "encourages its faculty to assist students in experiencing how the presence of God is manifest in nature, human history, in the struggles for economic and political justice, and other secular areas of the curriculum." Religion is a required subject for students enrolled at Salpointe, and the students are strongly encouraged to attend the Mass celebrated there each morning. As a result, a sign language interpreter would be called upon to translate religious precepts and beliefs during the course of James's education.

Sandra and Larry Zobrest, James's parents, feel compelled by their religious convictions to enroll James in a Catholic high school.

■ Prior to their son's enrollment at Salpointe, the Zobrests requested that the School District supply James with a certified sign language interpreter for his classes at Salpointe, beginning in August 1988. The School District petitioned the Pima County Attorney for an opinion on the constitutionality of providing such a service. The Deputy County Attorney subsequently advised that furnishing an interpreter would offend both state and federal constitutional prohibitions against a state establishment of religion. *See* U.S. Const. amends. I, XIV; Ariz. Const. art. 2, § 12. In June 1988, the Arizona Attorney General concurred in the Deputy County Attorney's opinion.[2]

In August 1988, the Zobrests initiated a civil action under the EHA, 20 U.S.C. § 1415(e), seeking an injunction requiring the School District to provide James with an interpreter. Pending the outcome of this litigation, the Zobrests have employed an interpreter for their son at their own expense. On August 15, 1988, the district court denied the Zobrests' request for a preliminary injunction. The court found that the Zobrests had not demonstrated a likelihood of success on the merits, because the provision of an interpreter would likely offend the first amendment's establishment clause.

On July 20, 1989, the district court granted the School District's motion for summary judgment, holding that the furnishing

---

**1.** The bulk of EHA benefits are targeted for students enrolled in public schools or placed in private schools by state or local officials. *See* 20 U.S.C. § 1413(a)(4)(B). When parents voluntarily enroll their handicapped children in private school, the state need not pay those children's tuition. 34 C.F.R. § 300.403(a). The state and local school district, however, still must provide "special education and related services" to the private school children. 34 C.F.R. § 300.452(a). For purposes of this litigation, the parties do not dispute that sign language interpretation is one of the "special education and related services" to which James is entitled. The parties agree that, if James's parents enrolled him in a non-sectarian private school or

public school, the School District would be obliged to provide a sign language interpreter for him.

**2.** The parties agreed that, in light of the Deputy County Attorney's and Attorney General's decisions, exhaustion of the EHA's administrative review procedure, 34 C.F.R. §§ 300.506 to 300.-510, would be futile. Exhaustion of the EHA's administrative procedures is not required when it is futile. *Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988); *see also Wilson v. Marana Unified School Dist.,* 735 F.2d 1178, 1181 (9th Cir.1984).

of a sign language interpreter would in fact offend the first amendment. The court noted that:

> The interpreter would act as a conduit for the religious inculcation of James—thereby promoting James's religious development at government expense. That kind of entanglement of church and State is not allowed.

*Zobrest v. Catalina Foothills School District,* No. CIV–88–516 (D.Ariz. Oct. 19, 1989) (order granting summary judgment). The court did not pass on the question of whether the employment of a sign language interpreter would also violate the Arizona Constitution. The Zobrests appeal this order.

## STANDARD OF REVIEW

■ We review the district court's grant of summary judgment de novo. *Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the law. *Tzung v. State Farm Fire and Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

■ Whether the provision of a state-financed sign language interpreter to a student enrolled in a private sectarian school violates the establishment clause is a question of constitutional law that we review de novo. *See Carreras v. City of Anaheim,* 768 F.2d 1039, 1042 n. 2 (9th Cir.1985). We likewise review de novo the constitutionality of the school district's decision to withhold aid from the Zobrests. *Id.*

## DISCUSSION

### I. The Establishment Clause

The first amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. This prohibition extends to the states through the fourteenth amendment.

*Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

### A. The Lemon v. Kurtzman Test

■ To "guide" the Establishment Clause inquiry, the Supreme Court has fashioned a three-part test. *Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983). In general terms, a statute will be upheld if: the statute has a "secular legislative purpose"; the statute's "principal or primary effect [is] one that neither advances or inhibits religion"; and, the statute does not "foster an excessive government entanglement with religion." *Id.* (citing *Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)).

### B. Secular Legislative Purpose

The Supreme Court has noted its "reluctance to attribute unconstitutional motives" to a statute's drafters, "particularly when a plausible secular purpose for the [program] may be discerned from the face of the statute." *Mueller v. Allen,* 463 U.S. at 394–95, 103 S.Ct. at 3067. The statutes at issue here evince a secular purpose.

In enacting the EHA, Congress made clear its secular purpose:

> It is the purpose of this Chapter to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and Localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. § 1400(c).

The Arizona counterpart to the EHA reveals a similar goal of providing the state's handicapped children with the assistance they might need to enjoy full and equal educational opportunities.

Thus, the EHA and the corresponding Arizona statutes pass the first part of the *Lemon* test. However, we find their pro-

posed application cannot survive the second part of that test.[3]

## C. *Statutes' Primary Effect*

In *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Supreme Court held that programs under which public school employees provided classes in private schools violated the Establishment Clause, where all but one of the private schools involved were sectarian in nature. The Court found that the programs "may impermissibly advance religion in three ways." *Grand Rapids*, 473 U.S. at 385, 105 S.Ct. at 3223. One of the impermissible effects the Court cited was that "the programs may provide a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school." *Id.* The Court noted, "Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines." *Id.*, 473 U.S. at 389, 105 S.Ct. at 3225. The Court cited a lower court opinion, which stated that, "Under the City's plan public school teachers are, so far as appearance is concerned, a regular adjunct of the religious school.... The religious school appears to the public as a joint enterprise staffed with some teachers paid by its religious sponsor and others by the public." *Id.*, 473 U.S. at 392, 105 S.Ct. at 3227 (quoting *Felton v. Secretary, United States Dept. of Ed.*, 739 F.2d 48, 67–68 (1984)). The Supreme Court concluded that "the symbolic union of government and religion in one sectarian enterprise ... is an impermissible effect under the Establishment Clause." *Grand Rapids*, 473 U.S. at 392, 105 S.Ct. at 3227; *see also Goodall by Goodall v. Stafford County Sch. Bd.*, 930 F.2d 363, 370–72 (4th Cir.) (provision of sign language interpreter to sectarian school student under EHA and Virginia implementing regulations would violate Establishment Clause), *cert. denied*, — U.S. —, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991).

Were we to sanction the aid the Zobrests seek, a public employee would be at James Zobrest's side in each of his classes at a sectarian school. With James, the employee would attend religion classes, the nominally "secular" subjects, in which as the parties stipulate, Salpointe faculty are encouraged to "assist students in experiencing how the presence of God is manifest," and the masses at which Salpointe encourages attendance. The interpreter would be the instrumentality conveying the religious message and experience. This presence and function of an employee paid by the government in sectarian classes would create the "symbolic union" *Grand Rapids* found impermissible. By placing its employee in the sectarian school to perform this function, the government would create the appearance that it was a "joint spon-

---

**3.** The Supreme Court has generally considered the validity of a challenged statute "on its face." *Bowen v. Kendrick*, 487 U.S. 589, 600, 108 S.Ct. 2562, 2569, 101 L.Ed.2d 520 (1988). However, "[t]here is ... precedent for distinguishing between the validity of a statute on its face and its validity in particular applications." *Id.*, 487 U.S. at 602, 108 S.Ct. at 2570. For example, in *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the Supreme Court ruled on the validity of South Carolina's aid under a revenue bond act to an individual college, rather than on the constitutionality of the act as a whole. The court stated: "To identify 'primary effect,' we narrow our focus from the statute as a whole to the only transaction presently before us." *Hunt*, 413 U.S. at 742, 93 S.Ct. at 2874. In *Bowen*, while the court found the challenged statute to be facially valid, it directed the district court to "consider on remand whether particular ALFA grants have had the primary effect of advancing religion." *Bowen*, 487 U.S. at 622, 108 S.Ct. at 2581. In this case, we consider only the validity of one very specific proposed application of the statutes at issue. Consideration of the statutes "as applied" seems particularly appropriate because their descriptions of the aid to be provided are extremely broad. *See* 20 U.S.C. § 1413(a)(4)(A) (requiring states to establish policies and procedures to ensure "by providing for such children special education and related services" that children with disabilities participate in aid programs); Ariz.Rev.Stat. § 15–764 (requiring educational authorities to "provide special education and related services for all handicapped children").

sor" of the school's activities.[4]

Two lines of cases the Zobrests cite in support of their appeal are distinguishable from the case at hand. First, this case does not involve "the sort of attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools from [a] neutrally available ... benefit...." *Mueller v. Allen,* 463 U.S. at 400, 103 S.Ct. at 3070. In *Mueller v. Allen,* the Supreme Court upheld a Minnesota program under which all parents were entitled to tax deduction for the cost of their children's "tuition, textbooks and transportation." The Court noted that, "by channeling whatever assistance it may provide to parochial schools through individual parents, Minnesota has reduced the Establishment Clause objections to which its action is subject." *Id.,* 463 U.S. at 399, 103 S.Ct. at 3069. Similarly, in *Witters v. Wash. Dept. of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the Court held that the award of special education assistance to a visually handicapped student who sought to use that assistance at a sectarian college did not violate the Establishment Clause. Again, the Court emphasized the private individual's decision in directing state provided aid: "In this case, the fact that aid goes to individuals means that the decision to support religious education is made by the individual, not by the State." *Witters,* 474 U.S. at 488, 106 S.Ct. at 752.

Were we to grant the Zobrests the relief they request, public aid would not be channeled to the sectarian school through the decision of an individual. Instead, the government would be required to place its own employee in the sectarian school. On the facts before us, these cases are unavailing.

Nor can the Zobrests rely on cases in which the Supreme Court has upheld the provision to sectarian schools of aid where the *"purely secular* content of the goods and services provided" was "easily ascertainable." *Goodall,* 930 F.2d at 371 (emphasis original). "It is, of course, true that as part of general legislation made available to all students, a State may include church-related schools in programs providing bus transportation, school lunches, and public health facilities—secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school." *Meek v. Pittenger,* 421 U.S. 349, 364, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217 (1975); *see also Lemon v. Kurtzman,* 403 U.S. at 616, 91 S.Ct. at 2113 ("Our decisions ... have permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities or materials."). In approving such aid to sectarian schools, the Supreme Court has been careful to emphasize the secular nature of this aid. For example, in *Board of Educ. v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Court upheld the provision of secular subject textbooks to all schools, including sectarian schools, in New York. The Court observed, "Although the books loaned are those required by the parochial school for use in specific courses, each book loaned must be approved by the public school authorities; only secular books may receive approval." *Allen,* 392 U.S. at 244, 88 S.Ct. at 1927. In *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Supreme Court upheld funding for the provision to sectarian schools of secular textbooks, standardized tests and scoring services, speech and hearing diagnostic services and off-site therapeutic and remedial services. In discussing each of these categories, the Court emphasized the secular nature of the aid provided and the capacity for its complete separation from any entanglement; for example, with regard to standardized tests, the Court noted: "The non-

---

4. One might attempt to distinguish *Grand Rapids* on the grounds that all but one of the courses at issue in that case were taught in elementary school, while the Zobrests seek aid for their son while he attends a Catholic high school. However, while the Supreme Court in *Grand Rapids* expressed special concern for

"children of tender years," 473 U.S. at 390, 105 S.Ct. at 3226, it did not limit its holding to elementary schools. Further, the Zobrests "feel it particularly essential that, at the time of adolescence, James be enrolled in a religious school." They thus implicitly acknowledge the vulnerability of young people of James' age.

public school does not control the content of the test or its result. This serves to prevent the use of the test as a part of religious teaching...." *Wolman*, 433 U.S. at 240, 97 S.Ct. at 2601. However, in *Wolman* the Court did not permit funding for the purchase of instructional materials for loan to parents or for field trip services; with regard to the latter category, the Court stated, "The field trips are an integral part of the educational experience, and where the teacher works within and for a sectarian institution, an unacceptable risk of fostering of religion is an inevitable by-product" *Id.*, 433 U.S. at 254, 97 S.Ct. at 2608.

Here, as the parties stipulate, the interpreter would be required to act in a school environment in which "the two functions of secular education and advancement of religious values or beliefs are inextricably intertwined." Unlike the aid approved in *Allen* and *Wolman*, then, the assistance the state would provide in this case cannot be said to be of a clearly secular and separable nature.[5]

Thus, if applied as the Zobrests propose, the statutes at issue fail to survive the second part of the *Lemon* test. We therefore find that state provision of the aid the Zobrests seek would violate the Establishment Clause.

## II. Free Exercise Clause

We turn now to the second issue the Zobrests raise: does denial of the assistance of a sign language interpreter unconstitutionally infringe on their rights under the Free Exercise Clause? We find that it does not.

■ The government places a burden on an individual's free exercise rights when it forces the individual to choose between adhering to her religion, thus forgoing state provided benefits, and abandoning a religious precept in order to receive those benefits. *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). The imposition of such a burden violates the Free Exercise Clause unless it is justified by some compelling state interest. *Id.*, 374 U.S. at 406, 83 S.Ct. at 1795. Thus, in *Sherbert v. Verner*, the Supreme Court held that South Carolina could not deny unemployment compensation to a member of the Seventh Day Adventist church because she refused to accept any job which required her to work on Saturday, her faith's Sabbath. *Id.*, 374 U.S. at 404, 83 S.Ct. at 1794. South Carolina sought to justify its restriction on benefits as a means of combatting fraud; however, the Supreme Court rejected this argument, noting that there was no evidence of fraud, nor had the state demonstrated that it could not accomplish its goal by some less restrictive means. *Id.*, 374 U.S. at 407, 83 S.Ct. at 1795–96.

■ Here, denial of aid to the Zobrests does impose a burden on their free exercise rights. They will have either to forgo a sectarian education for James in order to receive the assistance of a sign language interpreter for him at school, or they will have to pay the cost of the interpreter's services themselves, while keeping him at Salpointe.

However, a compelling state interest justifies the imposition of this burden. The government has a compelling interest in

---

**5.** It could be argued that we might uphold the statutes insofar as they permit James Zobrest to receive the services of a state-paid interpreter during "secular" subjects, prohibiting only the presence of the interpreter during religion classes and mass. While we do not find it otherwise necessary to discuss the third part of the *Lemon* test, we do note that such a solution would place this case within the "Catch 22" in which "the very supervision of the aid to assure that it does not further religion renders the statute invalid." *Bowen v. Kendrick*, 487 U.S. 589, 615, 108 S.Ct. 2562, 2578, 101 L.Ed.2d 520 (1988). Were we to uphold aid to the Zobrests under these conditions, the government would be required to monitor closely the interpreter's activities to ensure that assistance was not provided at prohibited times. Moreover, as religious instruction at Salpointe is not limited to specific classes, but pervades the entire curriculum, this monitoring would be the kind of "comprehensive, discriminating and continuing state surveillance," *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114, the Establishment Clause condemns. *See Meek v. Pittenger*, 421 U.S. at 369–72, 95 S.Ct. at 1765–67 (discussing entanglement problems created by need to ensure that "teachers play a strictly nonideological role").

ensuring that the Establishment Clause is not violated. *Goodall,* 930 F.2d at 370; *see also Doe v. Village of Crestwood, Ill.,* 917 F.2d 1476 (7th Cir.1990) (affirming grant of injunction against mass during public festival held in public park; government cannot convey the message that it is endorsing religion). It is difficult to imagine a more compelling interest than avoiding a violation of the Constitution. Likewise, here, there is no "less restrictive means" by which the state may accomplish that goal.

Thus, the refusal to provide James Zobrest with a state paid sign language interpreter while he attends a sectarian high school does not violate the Free Exercise clause.[6]

The judgment of the district court is AFFIRMED.

TANG, Circuit Judge, Dissenting:

"Justice," Judge Learned Hand once observed, "is the tolerable accommodation of the conflicting interests of society." Few cases more aptly demonstrate the truth of Judge Hand's words than the appeal before us now. For the efforts of the Zobrest family to educate their deaf son in a manner compelled by their religious faith require us to engineer a delicate constitutional balance between the competing goals of freedom of religion, separation of church and state, and equal educational opportunities for the handicapped. The Zobrests have presented us with a ponderous constitutional conundrum, made worse by the opacity of First Amendment jurisprudence. Given the competing values at stake, I cannot fault the majority's resolution of this case. I can state only that I disagree. I believe that the state's provision of a sign language interpreter to James Zobrest for his studies in a Catholic high school would not transgress the First Amendment's prohibition against the establishment of reli-

gion. I would therefore reverse the judgment of the district court.

## DISCUSSION

### I. The Establishment Clause

State action impacting religion will survive an Establishment Clause challenge if the action (1) has a secular legislative purpose; (2) has a principal or primary effect that neither advances nor inhibits religion; and (3) does not excessively entangle government with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2110–11 (1971).

### A. *Secular Legislative Purpose*

I agree with the majority's conclusion that the federal Education of the Handicapped Act ("EHA"), 20 U.S.C. § 1401(a)(1), and its Arizona counterpart, Ariz.Rev.Stat. § 15–761(6), pass the first leg of the *Lemon* test because they have secular legislative purposes. That the aid provided under the program would on this occasion benefit religion or religious exercise does not preclude a finding of secular purpose. In *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 485–86, 106 S.Ct. 748, 750–51, 88 L.Ed.2d 846 (1986), the Supreme Court held that educational assistance provided by the state to visually handicapped students served a valid secular purpose, despite its application in that particular instance to a religious institution. Washington's effort "to promote the well-being of the visually handicapped through the provision of vocational rehabilitation services" constituted a legitimate governmental interest and goal. *Id.* The fact that some small portion of the state's funds ultimately flowed to a religious institution did not undercut the laudatory secular purpose of the law. *Id.* at 486, 106 S.Ct. at 751.

6. The Zobrests also argue that denying James Zobrest the assistance of a sign language interpreter would violate the Equal Protection Clause. As our analysis above makes clear, in this context the Free Exercise clause does not provide a fundamental right for the Zobrests: they have no entitlement to state support for James' religious education in the form they

seek. Nor can the Zobrests show that the state's treatment of James Zobrest is subject to strict scrutiny because he is a member of a protected class. The state's refusal to send a state-paid interpreter into a religious school is rationally related to its goal of avoiding a violation of the First Amendment. Thus, the Zobrests' Equal Protection argument must fail.

Similarly, in *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Supreme Court held that a state's decision to defray by means of a tax deduction educational expenses incurred by parents "evidences a purpose that is both secular and understandable." *Id.* at 395, 103 S.Ct. at 3067. The Court reasoned that:

> An educated populace is essential to the political and economic health of any community, and a State's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the State's citizenry is well-educated.

*Id.; see also Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973) (the issuance of revenue bonds to assist all colleges in constructing and financing projects has a valid secular purpose because the legislature intended to provide its youth " 'the fullest opportunity to learn and to develop their intellectual and mental capacities' ") (quoting S.C.Code Ann. § 22.41 (Supp.1971)).

Because government has a valid secular interest in cultivating the talents and skills of handicapped children and in removing barriers to the achievement of their full academic potential, I agree that neither the EHA nor its companion Arizona law has as its purpose the endorsement or promotion of religion.

### B. *Primary Effect*

State actions run afoul of the second branch of the *Lemon* test if they "result[ ] in the direct and substantial advancement of religious activity." *Meek v. Pittenger*, 421 U.S. 349, 366, 95 S.Ct. 1753, 1764, 44 L.Ed.2d 217 (1975). On the other hand, the Establishment Clause will tolerate measures that only indirectly impact upon religion. *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 771, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) ("[N]ot every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid.").

The majority holds that the provision of a sign language interpreter to James Zobrest is unconstitutional because it would have the primary effect of advancing religion. The majority raises the specter of a symbolic union of church and state, and dismisses as inapplicable cases in which similar general educational welfare programs have passed constitutional muster.

I strongly disagree with the majority's interpretation of the relevant precedents and fear that they have exalted form over substance at the expense of handicapped children.

In arguing that the provision of an interpreter would have the primary effect of advancing religion, the majority erroneously focuses on the specific use to which the aid will be put in this case. The proper query is whether the program as a whole has the proscribed primary effect of advancing religion. In *Witters*, a blind student sought to apply Washington's vocational rehabilitation assistance to his religious studies at a private Christian college. The Supreme Court held that the primary effect prong of the *Lemon* test did not forbid the aid. In so holding, the Supreme Court analyzed the entirety of Washington's educational assistance for the handicapped program. *Witters*, 474 U.S. at 487–88, 106 S.Ct. at 751–52; *see also id.* at 492, 106 S.Ct. at 754 (Powell, J., concurring) (analyzing whether program aids religion only in context of particular case before the court "conflicts both with common sense and precedent").

Similarly, in *Mueller*, the Supreme Court focused not on whether the tax exemption at issue actually permitted the particular parents to send their children to religious schools. Rather, the Court looked to the broad class of beneficiaries of the exemption, which included all parents of school-age children, whether enrolled in public or nonpublic schools, and concluded that " '[t]he provision of benefits to so broad a spectrum ... is an important index of secular effect.' " 463 U.S. at 397, 103 S.Ct. at 3068 (quoting *Widmar v. Vincent*, 454 U.S. 263, 274, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981)); *see also Board of Educ. v. Allen*, 392 U.S. 236, 243–44, 88 S.Ct. 1923, 1926–27, 20 L.Ed.2d 1060 (1968) (the provision of

secular textbooks does not have as its necessary effect the advancement of religion because the overall benefits of the program extend to all school children; the Court does not analyze the particular effect of the textbook grant on religious students alone); *Everson v. Board of Educ.*, 330 U.S. 1, 17–18, 67 S.Ct. 504, 512–13, 91 L.Ed. 711 (1947) (same—with respect to transportation to school). Indeed, the use of the word "primary" in the test connotes a survey of the legislation's total operation, rather than its particular application in the pending case.

I recognize, as does the majority, that the Supreme Court has not always been consistent in applying the primary effects test. In *Hunt*, 413 U.S. at 742, 93 S.Ct. at 2874, the Supreme Court considered the particular application of a governmental program, rather than its general operation, in assessing primary effect. *See also Bowen v. Kendrick*, 487 U.S. 589, 602, 108 S.Ct. 2562, 2570–71, 101 L.Ed.2d 520 (1988). Given how closely analogous the *Witters* case is to the one at hand—both involve the constitutionality of general educational benefits programs for the handicapped when applied to religious schools—the primary effects test *Witters* prescribes should govern this case. But even assuming that the narrow primary effect test imposed by the majority were correct, I would still hold that the provision of a sign language interpreter to James Zobrest does not have the primary effect of advancing religion. In holding otherwise, the majority and district court misread and misapply the Supreme Court's opinions in *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) and *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753. Those cases differ in four significant ways from the one at hand.

First, the legislation at issue in *Grand Rapids* and *Meek* was not the type of general welfare legislation involved here. *Grand Rapids* and *Meek* involve aid programs targeted solely to private schools—the vast majority of which, the Supreme Court emphasized, are sectarian. *Grand Rapids*, 473 U.S. at 384, 105 S.Ct. at 3222 (forty out of forty-one of Grand Rapids's

nonpublic schools "are identifiably religious schools"); *Meek*, 421 U.S. at 364, 95 S.Ct. at 1762–63 (more than 75 percent of Pennsylvania's nonpublic schools "are church-related or religiously affiliated educational institutions"); *see also Public Funds for Public Schools v. Marburger*, 358 F.Supp. 29 (D.N.J.1973) (three-judge court), *aff'd mem.*, 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974). In other words, the Supreme Court considers the identification of legislation's primary beneficiary to be a critical consideration in determining whether a statute's primary effect is to benefit religion. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 10–11, 109 S.Ct. 890, 897–98, 103 L.Ed.2d 1 (1989) (plurality) (general programs of governmental assistance promoting legitimate secular goals do not have the primary effect of advancing religion even if they relieve religious groups of costs they would otherwise incur; programs targeted exclusively to religious entities, however, are probably unconstitutional).

General welfare programs neutrally available to all children, in both public and private schools, do not suffer the same constitutional disability because their benefits diffuse over the entire population. Religious institutions are incidental, not primary, beneficiaries of such statutory schemes. In *Witters*, the Supreme Court emphasized that Washington's program provided educational assistance to all handicapped students in the state " 'without regard to the sectarian—nonsectarian, or public—nonpublic nature of the institution benefited.' " *Id.* at 488, 106 S.Ct. at 752 (quoting *Nyquist*, 413 U.S. at 782–83 n. 38, 93 S.Ct. at 2970 n. 38). The broad reach of Washington's vocational assistance program guaranteed that no "significant portion of the aid expended under the Washington program as a whole will end up flowing to religious education." *Witters*, 474 U.S. at 488, 106 S.Ct. at 752.

Likewise, the EHA is a general welfare program providing benefits such as sign language interpretation to all handicapped children, whether they are enrolled in public or private school. Furthermore, the ex-

pansive scope of the EHA and its Arizona counterpart ensures that the bulk of the aid provided will be used in nonsectarian schools. Handicapped children across the country enrolled in public and private schools, not religious institutions, are the "primary beneficiaries" of the EHA's and Arizona law's benefits.

Indeed, in evaluating the constitutionality of educational aid given only to private schools, the Supreme Court has been at pains to distinguish cases like the one at hand, where the state provides assistance broadly to all schools, all school children, or all parents. In *Meek*, the Court specifically stated:

> The appellants do not challenge and we do not question, the authority of the [state] to make free auxiliary services available to all students in the [state] including those who attend church-related schools. Contrary to the argument advanced in a separate opinion filed today, therefore, *this case presents no question whether the Constitution permits the States to give special assistance to some of its children whose handicaps prevent their deriving the benefit normally anticipated from the education required to become a productive member of society and, at the same time, to deny those benefits to other children only because they attend a Lutheran, Catholic, or other church-sponsored school.*

*Id.* at 368 n. 17, 95 S.Ct. at 1764 n. 17 (quotation omitted) (emphasis added); *see also Wolman v. Walter*, 433 U.S. 229, 243 & n. 11, 97 S.Ct. 2593, 2603 & n. 11, 53 L.Ed.2d 714 (1977); *Nyquist*, 413 U.S. at 782–83 n. 38, 93 S.Ct. at 2970 n. 38. Because the benefits provided by the EHA and Arizona law do not benefit religious institutions primarily or even significantly, those cases holding unconstitutional various forms of aid given only to private schools are not controlling here.

Second, *Grand Rapids* and *Meek* involved educational assistance that either directly or indirectly compensated religious institutions for costs they bore in the course of educating their students. In

*Grand Rapids*, state-financed teachers appeared in private schools offering classes to private school students, thus relieving religious institutions of the responsibility (financial and otherwise) of teaching secular subjects. 473 U.S. at 395–97, 105 S.Ct. at 3229. In *Meek*, the school received instructional materials and equipment directly from the state, disburdening the school of an otherwise necessary cost of performing its educational function. 421 U.S. at 365–66, 95 S.Ct. at 1763–64.

The provision of a sign language interpreter, on the other hand, would not result in state funds directly or even indirectly flowing to Salpointe. The public School District, not the private school, employs and pays the interpreter. The provision of an interpreter, moreover, would not relieve Salpointe of any preexisting financial or educational obligation. Nothing in the record or argument suggests that, without state aid, Salpointe itself will undertake the burden of employing an interpreter for James. To the contrary, James's parents have independently hired an interpreter pending the outcome of this litigation.

Third, in *Grand Rapids* and *Meek*, the state, by virtue of its legislation, affirmatively directed educational assistance to religious institutions. By contrast, to the extent Salpointe benefits at all from the EHA program, it does so only as a consequence of independent decisionmaking by the Zobrests. It is because the Zobrests' chose to enroll James in a Catholic high school, and not because of any legislative decree, that EHA benefits will be employed in a sectarian environment. "The historic purposes of the [Establishment] Clause simply do not encompass the sort of attenuated financial benefit, *ultimately controlled by the private choices of individual parents*, that eventually flows to parochial schools from the neutrally available ... benefit at issue in this case." *Mueller*, 463 U.S. at 400, 103 S.Ct. at 3070 (emphasis added).

In *Witters*, the Supreme Court found constitutionally significant the fact that religious institutions would receive vocational assistance "only as a result of the genuine-

ly independent and private choices of aid recipients" to attend a religious educational institution. 474 U.S. at 487, 106 S.Ct. at 751. The Supreme Court noted that Washington's vocational assistance program made funds available generally. *Id.* The pupil—not the state—determined whether a religious institution would receive any of the available funds. There, as here, the state created no incentives for students to select sectarian schools and played no role in the decisionmaking process that ultimately determined where the funds would be spent. *Id.* at 488, 106 S.Ct. at 751–52.

Under the EHA and Arizona law, neither the state nor religious bodies can dictate whether, or how much, aid will benefit sectarian institutions. According to the relevant statutory provisions, the sign language interpreter is an employee of the local school district. The sectarian school never receives or even sees the funds used to hire the interpreter. The only persons directly benefiting from the aid are the parents, who are relieved of the financial obligation of paying for a sign language interpreter out of their own pockets, and of course the deaf student. Any indirect benefit enjoyed by Salpointe would be attributable solely to the Zobrests' independent decision to apply neutrally available state aid to their son's education in a sectarian school, and not to any "*State* action sponsoring or subsidizing religion." *Id.* at 488–89, 106 S.Ct. at 751–52 (emphasis in original).

Fourth, unlike *Grand Rapids*, 473 U.S. at 385, 105 S.Ct. at 3223, no symbolic union of church and state inheres in the simple act of paying the salary of a sign language interpreter. The role played by the interpreter is narrow, isolated, and unique. Private teachers and students, not the interpreter, will be the source of religious doctrine. The state, for its part, is simply facilitating the education of handicapped students on a general and nondiscriminatory basis. That the state's resources will be used to convey sectarian as well as secular ideas does not necessarily create an impermissible union of church and state. *Cf. Board of Educ. v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (public high school facilities may be used for meetings of religious clubs in part because "secondary school students are mature enough and are likely to understand that a school does not endorse or support speech that it merely permits on a nondiscriminatory basis").

The majority places undue emphasis on the fact that the interpreter, a state-paid employee, will perform her services in a sectarian classroom. The First Amendment, however, does not absolutely prohibit the placement of state-paid personnel in religious schools. *See Wolman*, 433 U.S. at 241–44, 97 S.Ct. at 2602–03 (state may provide health diagnostic technicians to parochial schools). Nor does the First Amendment strictly foreclose the provision of classroom services by the state. *Allen* upheld the provision of textbooks to parochial school children despite the risk that the books' themes would provide the fodder for religious lessons. 392 U.S. at 243–44, 88 S.Ct. at 1926–27. *Witters* went even further and authorized the use of state funds to pay a student's tuition at a religious institution, thereby contributing to the salaries of sectarian instructors.

True, the money in *Witters* went first to the student and then to the school, whereas in this case the money goes from the state directly to the interpreter. But First Amendment rights should not depend on how circuitous a money trail the government constructs. Rather, the constitutionality of extending generally-available benefits to parochial students should be determined by reference to the substantive nature and quality of the aid provided. Functional analysis, not formalistic line-drawing, must be undertaken. A careful study of the nature of the sign language interpreter's task belies the majority's concerns about a symbolic union of church and state.

A sign language interpreter performs a mechanical service, changing words from one language into another. An interpreter neither adds to nor detracts from the message she conveys, nor does she interject personal views and philosophies into the translation. Unlike teachers and therapists, the sign language interpreter is a

technical facilitator of communication, not a potential fount of religious doctrine.

I do not understand the majority to say that the First Amendment would be offended by the state's provision of a hearing aid or eyeglasses to a parochial school student. Yet these products, like an interpreter, make it possible for a physically-impaired student to receive and decipher religious messages. Perhaps we are not far from the time when machines will be able to translate oral communications into visual cues for the hearing impaired. But we are not there yet. Consequently, because of the nature of his handicap, James Zobrest requires human, rather than purely mechanical, assistance in the classroom. But this distinction should not obscure our evaluation of the nature of the service being performed. A sign language interpreter remains, like a hearing aid, a conveyor, and not an independent source, of communication. Under the circumstances of this case, I do not consider the step from a hearing aid to a sign language interpreter to be a difference of constitutional magnitude.

Further undercutting the majority's symbolic union concern is a recognition that the interpreter's role in the classroom touches only one student. She will not be involved at all in the education of the rest of the student body. Students and the public are thus not likely to be confused by or to have trouble understanding where the state service ends and the religious begins. *Cf. Grand Rapids,* 473 U.S. at 391, 105 S.Ct. at 3226 ("[S]tudents would be unlikely to discern the crucial difference between the religious school classes and the 'public school' classes.").

That the interpreter's appearance in a Catholic school is wholly attributable to the independent decisionmaking of the parents, rather than the actions of the state, further undercuts any symbolic union of the two entities. *Witters,* 474 U.S. at 488–89, 106 S.Ct. at 752 ("Nor does the mere circumstance that petitioner has chosen to use neutrally available state aid to help pay for his religious education confer any message of State endorsement of religion."). In fact, the withholding of vital assistance

from a handicapped child solely because of his sincere religious desire to be educated in a Catholic school would evince hostility, not neutrality, towards religion. "The Establishment Clause does not license government to ... subject [religious practitioners] to unique disabilities." *Mergens,* 496 U.S. at 248, 110 S.Ct. at 2371 (quoting *McDaniel v. Paty,* 435 U.S. 618, 641, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring in judgment)).

Rather than suggest an impermissible connection between church and state, the provision of an interpreter would simply demonstrate to the public the government's desire to equalize the educational opportunities of all its students and to help handicapped students overcome barriers to their full academic development. Such aid is religion-blind.

For the foregoing reasons, I would hold that the provision of a sign language interpreter, under the EHA and Arizona law, to a student enrolled in a religious school does not have the primary effect of advancing religion.

### C. *Excessive Entanglement*

The third inquiry prescribed by *Lemon* is determining whether excessive entanglement results from the government's program. To decide whether the provision of a sign language interpreter would sufficiently enmesh the government in religious matters to offend the Establishment Clause, one must assess carefully the interrelationship of church and state that results when such assistance is provided a student.

The district court ruled that state supervision of the interpreter and the nature of her task would unconstitutionally entangle the state in Salpointe's sectarian educational process. The district court noted that, like the therapists whose services were declared unconstitutional in *Wolman,* 433 U.S. 229, 97 S.Ct. 2593, the sign language interpreter enjoys close, day-to-day contact with the student in a pervasively religious atmosphere. *Id.* at 247–48, 97 S.Ct. at 2605. The Supreme Court in *Wolman* felt that this created a danger that "the pres-

sures of the environment might alter [the therapist's] behavior from its normal course" and result in the transmission of ideological views. *Id.* at 247, 97 S.Ct. at 2605. The district court perceived the same risk in this case. Although the majority does not reach the entanglement stage of the *Lemon* test, I discuss it to demonstrate the constitutional propriety of affording EHA benefits to parochial students.

In reviewing the district court's decision, I turn first to the question whether supervision of the interpreter's job performance will require the government to intrude unconstitutionally upon Salpointe's religious affairs. Next, I address whether the process of sign language interpretation itself impermissibly involves a state-paid employee in matters of religious doctrine. It should be emphasized at the outset that the mere existence of some interrelationship and cooperation between the School District and Salpointe will not run afoul of the First Amendment. It is only "excessive" entanglement that the Constitution condemns. *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111; *cf. Texas Monthly,* 489 U.S. at 10, 109 S.Ct. at 897 ("Government need not resign itself to ineffectual diffidence because of exaggerated fears of contagion of or by religion, so long as neither intrudes *unduly* into the affairs of the other.") (emphasis added).

### 1. Supervision

Both parties recognize that the provision of a publicly-funded sign language interpreter necessarily carries with it the baggage of supervision by public officials. The interpreter will receive periodic evaluations of the quality of her work. The School District's special education officials will also need to review at least annually James's educational progress.

Such supervision standing alone does not create constitutionally intolerable levels of state/church involvement. The Constitution will tolerate limited supervisory interactions between public officials and private schools. In *Wolman,* the Supreme Court held that the state's provision of diagnostic health services to private school students did not transgress the Establishment Clause because the program resulted in only limited contact between public officials, religious officials, and students. 433 U.S. at 244, 97 S.Ct. at 2603. Likewise, in *Mueller,* the Supreme Court sustained a tax exemption despite the fact that it required public officials to determine whether textbooks promoted religious themes. 463 U.S. at 403, 103 S.Ct. at 3071. Such carefully channeled interactions do not rise to the level of excessive entanglement. *See also Hernandez v. Commissioner,* 490 U.S. 680, 696–97, 109 S.Ct. 2136, 2147, 104 L.Ed.2d 766 (1989) ("[R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring and close administrative contact between secular and religious bodies does not of itself violate the nonentanglement command.") (quotation and citations omitted); *Allen,* 392 U.S. at 245, 88 S.Ct. at 1927 (officials may label textbooks as secular or sectarian).

Supervision limited to evaluating the sign language interpreter's job performance does not involve the type of day to day, "comprehensive, discriminatory, and continuing state surveillance" that *Lemon* precludes. 403 U.S. at 619, 91 S.Ct. at 2114. The School District does not suggest that public officials will appear daily, weekly, or even monthly in the classroom as part of their supervisory work. No extra supervision is needed simply because the interpreter works in a sectarian school.[1]

---

**1.** The supervisory entanglement concerns raised by this case thus do not follow the norm. The supervision at issue in an entanglement inquiry frequently pertains to the government's attempts to ensure that its aid is being used only for secular purposes. *See, e.g., Aguilar v. Felton,* 473 U.S. 402, 411, 105 S.Ct. 3232, 3237, 87 L.Ed.2d 290 (1985); *Mueller,* 463 U.S. at 403,

103 S.Ct. at 3071; *Lemon,* 403 U.S. at 616, 91 S.Ct. at 2113. In this case, however, the supervision relates only to review of a public employee's performance. As in *Witters,* it is a given in this case that the state's assistance cannot be confined to a wholly secular role and will, in fact, permit the recipient to receive religious instruction. The supervision at issue thus

Evaluations of the interpreter's work, moreover, will not routinely or necessarily involve the supervising officials in religious matters. Nor does the supervision involve the sheer number of public officials inundating religious establishments that occurred in other cases. The services at issue here, after all, will not be provided to the entire student body. The number of deaf children enrolled in a single parochial school at any given time will be sufficiently low to avoid visiting large numbers of state officials upon the institution. Thus the supervision of James's interpreter will not implicate religious concerns to the same extent as other Establishment Clause cases have.

I would therefore hold that the church/state contacts involved in supervising a sign language interpreter's job performance are sufficiently contained and abbreviated to prevent excessive entanglement.

### 2. Nature of the Job

The second entanglement inquiry concerns the nature of the sign language interpreter's task. The parties stipulated that, as a general matter, the interpreter's code of ethics obliges her to translate communications completely, without altering, editing, or revising in any manner the content of the message. It is conceded that at times the interpreter will be unable to affect a literal translation of a communication, including religious messages. In such circumstances, the interpreter must use her own judgment and, to the best of her ability, convey the message as accurately as possible.

The nature of the interpreter's role in the classroom does not entail excessive entanglement between a state-paid employee and the church. As noted earlier, the First Amendment does not strictly forbid the placement of any public employee in a parochial school classroom. *Wolman*, 433 U.S. at 241–44, 97 S.Ct. at 2602–03. While the Court has ruled that the presence of state-financed teachers and therapists or counselors in parochial schools offends the First Amendment, *Grand Rapids*, 473 U.S. at 387, 105 S.Ct. at 3224; *Meek*, 421 U.S. at 369–71, 95 S.Ct. at 1765–66, the concerns animating those holdings do not obtain in this instance.

The primary entanglement concern articulated by the Supreme Court in *Grand Rapids* and *Meek* is an apprehension that the pervasively religious atmosphere in which the professionals work is likely to infuse their teaching or advice with some religious content. *Grand Rapids*, 473 U.S. at 387, 105 S.Ct. at 3224 ("[T]here is a substantial risk that, overtly or subtly, the religious message they are expected to convey during the regular schoolday will infuse the supposedly secular classes they teach after school. The danger arises 'not because the public employee [is] likely deliberately to subvert [her or] his task to the service of religion, but rather because the pressures of the environment might alter [her or] his behavior from its normal course.'") (quoting *Wolman*, 433 U.S. at 247, 97 S.Ct. at 2605); *Meek*, 421 U.S. at 371, 95 S.Ct. at 1766; *see also Wolman*, 433 U.S. at 247, 97 S.Ct. at 2605 ("[U]nlike the diagnostician, the therapist may establish a relationship with the pupil in which there might be opportunities to transmit ideological views."); *Lemon*, 403 U.S. at 618–19, 91 S.Ct. at 2114 ("We simply recognize that a dedicated religious person ... will inevitably experience great difficulty in remaining religiously neutral.... With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine.").

Unlike teachers and therapists, a sign language interpreter's job admits of few, if any, opportunities for the transmission or fostering of personal sectarian sentiments. While recognizing that working as a sign language interpreter is both difficult and challenging, the interpreter's services are distinctly more cabined than those of a

---

avoids the Catch–22 that occurs when the Establishment Clause, on the one hand, requires assurances that aid does not promote sectarian purposes and, on the other hand, uses that very

supervision to invalidate the program on entanglement grounds. *See Bowen*, 487 U.S. at 615, 108 S.Ct. at 2577.

teacher or therapist. James's interpreter simply takes a message conceived and uttered by one person and neutrally translates it into a comprehensible form for a second person. The expressions and instruction, religious or not, neither originate nor terminate with the interpreter. As the district court noted, she is just a conduit. Unlike teachers and therapists, her function does not entail the discretion to introduce her own independent or subjective judgments and opinions, to speak her own words, or to transmit her own ideas. Rather, the interpreter performs the more mechanical and objective task of searching for signs that equate with spoken words, and vice versa. The scientific, technical nature of sign language interpretation thus more closely approximates the services of a speech and hearing diagnostician, than of a teacher.

Occasionally, it is true, non-literal translations will have to be made. But even in these narrow instances, the interpreter's role remains confined to a technical search for words and signs that closely approximate each other. I do not believe that the minimal discretion inhering in such decisions creates an unconstitutional risk that the interpreter will use the opportunity to convey her own religious ideas, in violation of her professional ethical obligation to translate accurately.

In sum, I believe that the provision of a sign language interpreter to James Zobrest under the EHA and Arizona law would not unconstitutionally entangle the state in religious affairs. A careful review of the concerns animating the Supreme Court's First Amendment precedents, a thoughtful study of the nature of an interpreter's services, and due respect for the purpose and effects of educational assistance to handicapped children dictate the conclusion that the provision of a sign language interpreter to a deaf child enrolled in parochial school does not result in an unconstitutional fusion of the secular and the sectarian.

2. The parties have not argued that the federal government's desire to separate church and state constitutes a compelling interest overriding the Zobrests' free exercise rights. Accordingly, I do not address either the applicabil-

## II. The Free Exercise Clause

I agree with the majority's conclusion that denying the Zobrests a sign language interpreter unconstitutionally burdens their free exercise of religion.

However, because I do not believe that the provision of a sign language interpreter in this case violates the Establishment Clause of the federal Constitution, I would hold that no compelling interest justifies the state's withholding of benefits. To the extent the School District has an interest in separating church and state further than required by the First Amendment, that interest must yield to the Zobrests' free exercise rights. "[T]he State interest asserted here—in achieving greater separation of Church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause." *Widmar*, 454 U.S. at 276, 102 S.Ct. at 277. The Zobrests' free exercise rights would also override any additional anti-establishment constraints imposed by the Arizona constitution. *Id.* at 275–76, 102 S.Ct. at 277–78. The School District has articulated no other reason or interest in withholding aid from the Zobrests.[2]

## CONCLUSION

Almost twenty years ago, the Supreme Court observed that:

the transcendent value of free religious exercise in our constitutional scheme leaves room for "play in the joints" to the extent of cautiously delineated secular governmental assistance to religious schools, despite the fact that such assistance touches on the conflicting values of the Establishment Clause by indirectly benefiting the religious schools....

*Norwood v. Harrison*, 413 U.S. 455, 469, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973).

ity or constitutionality in this context of the federal prohibition on the use of EHA funds for religious "worship, instruction, or proselytization." 34 C.F.R. § 76.532 (1991).

With this statement, the Court capsulized the lessons of nearly two centuries of experience interpreting the First Amendment's religion clauses. Rigid enforcement of one clause generally comes at the expense of the other. Only through the careful accommodation of evolving constitutional concerns and values—through "play in the joints"—can these competing precepts achieve their common goal of preserving freedom of religion.

I believe that the provision of a sign language interpreter to a deaf child enrolled in parochial school constitutes such "cautiously delineated secular governmental assistance." Government's provision of this general welfare benefit to all qualifying school children equally does not create an impermissible establishment of religion. On the other hand, singling out for exclusion from this benefit program only those students engaged in religious conduct compelled by conscience does offend the Free Exercise Clause.